874 F.2d 193
 57 USLW 2708, Fed. Sec. L. Rep. P 94,431
 CNW CORPORATION,
v.
JAPONICA PARTNERS, L.P., P.B. Kazarian, Ltd., Paul B.
Kazarian, M.G. Lederman, Ltd., Michael Lederman, Phoenix
Partners, L.P., Botanic Partners, L.P., Pigeon Investors,
L.P., Raven Partners, L.P., and Bates Partners, L.P.
 No. 89-3258.
 United States Court of Appeals,
Third Circuit.
 Argued May 10, 1989.
Decided May 17, 1989.
 
 Thomas C. Grimm, Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Harold C. Hirshman (argued), Robert B. Millner, Stuart Altschuler, Katharine B. Devoid, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for appellant CNW Corp.
 Barry L. Katz (argued), Joseph Giovanniello, Jr., Jodi Levine Avergun, Shereff, Friedman, Hoffman & Goodman, New York City, for appellees.
 Before GIBBONS, Chief Judge, STAPLETON and WEIS, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 This appeal arises out of a campaign by the appellee-defendants to elect their slate of candidates to CNW Corporation's (CNW) board at the annual shareholders meeting on May 16, 1989. CNW, resisting appellees' attempt, sought preliminary and permanent injunctive relief in the district court, claiming that appellees' Schedule 13D and 14B filings violated Secs. 13(d) and 14(a) of the Securities Exchange Act of 1934 (the 1934 Act) and SEC rules promulgated thereunder. The district court denied CNW's request for a preliminary injunction and its request for an injunction pending appeal on April 14, 1989.
 
 
 2
 CNW filed this appeal and promptly moved for expedition and injunctive relief. We expedited the briefing and heard argument on the merits of the appeal on May 10, 1989. Immediately following oral argument, we entered an order enjoining appellees, pending the filing of an opinion and judgment, from soliciting proxies for the upcoming meeting until it disclosed the names of the limited partners of Botanic Partners, L.P., Pigeon Investors, L.P., Raven Partners, L.P., and Bates Partners, L.P., and the names of parties to certain "coinvestor" agreements. Having considered the appeal on its merits, we will affirm in part and reverse in part.
 
 I.
 
 3
 CNW is a major interstate rail carrier. Paul B. Kazarian is the president, director, and controlling person of P.B. Kazarian, Ltd. Michael G. Lederman is the chairman of the board, director, and controlling person of M.G. Lederman, Ltd. Their eponymous companies are the general partners of Japonica Partners, L.P. ("Japonica"), which in turn is the sole general partner of five limited partnerships: Phoenix Partners, L.P.; Botanic Partners, L.P.; Pigeon Investors, L.P.; Raven Partners, L.P.; and Bates Partners, L.P.
 
 
 4
 In November 1988, Japonica met with CNW's CEO and Chairman, Robert Schmiege, to discuss Japonica's theory that CNW's stock was grossly undervalued by the market. Japonica apparently sought management to take certain steps to exploit CNW's undervalued assets. CNW, however, cut off the discussions, evidently uninterested in cooperating with Japonica.
 
 
 5
 Japonica began formulating and exploring other steps that could be taken toward acquiring control of CNW, dubbing its efforts "Project Eagle." To attract investors to finance its attempt at control, Japonica developed written materials, with two lengthy books produced in January and February 1988. The books presented various valuations and projected valuations of CNW's assets. In addition, the books presented detailed accounts of several financial scenarios that could be brought into play if control of CNW were obtained, including leveraged buyouts of some of CNW's assets, sale of some or all of the assets, merger, corporate restructuring, and recapitalization. The books further detailed the projected effect of each scenario on an investor's return. The overarching impression these books were apparently intended to impart to the would-be investor was that, because the then-current market price of CNW's stock understated the value of CNW, gaining control of CNW (even at a purchase price per share considerably above the market price), would be very profitable regardless of which scenario was eventually followed. All of the projections were based upon public information.
 
 
 6
 Japonica's sales pitch was successful. On January 19, 1989, Japonica entered a "coinvestor agreement" with a thus-far undisclosed individual or entity whereby that person would give $10 million to Japonica to invest in CNW stock. The coinvestor retained beneficial ownership of the shares, but Japonica was given the authority to hold or sell these shares as it saw fit, and an irrevocable proxy to vote the shares. The January 19 coinvestor agreement was terminated on March 1. On February 15, 1989, Japonica entered into another coinvestor agreement with an undisclosed individual or entity. That agreement has not been disclosed by Japonica, although a letter terminating it on March 1 has been disclosed, albeit with the name of the coinvestor redacted.
 
 
 7
 Japonica was also successful in attracting investors willing to become limited partners in partnerships "formed for the purpose of acquiring shares of the Common Stock" of CNW. Japonica's Schedule 13D, item 2(c), app. at 11. Each limited partner--of which there were no more than ten[1]--contributed at least $3 million. The agreements gave the general partner "full and complete charge of all affairs of the Partnership," including the right to commence a tender offer, but the latter right was subject to the proviso that "a majority in interest of the Limited Partners [does] not object." App. at 286, 290, 294, 298, 301.[2] In the case of the Phoenix, Botanic, and Pigeon partnerships, the limited partners contributed an undisclosed number of their own CNW shares to the respective partnerships.[3]
 
 
 8
 The limited partnerships came into effect on March 1, 1989, and by March 3, Japonica had crossed the five-percent threshold that triggers a potential acquiror's obligation to file a Schedule 13D within ten days.[4] On March 13, 1989, Japonica filed a Schedule 13D, disclosing that it had acquired an 8.8% interest in CNW.
 
 
 9
 The 13D also revealed that Japonica "sought to acquire control of CNW," see Item 4, app. at 13, possibly through a tender offer, "subject to the availability of financing on acceptable terms, regulatory approvals and certain other conditions." Id. Japonica also stated that it expected to propose nominees for CNW's board of directors at the next annual meeting, and that Kazarian and Lederman would likely be among those nominees. In addition, Japonica outlined its intentions if it were to be successful in gaining control:
 
 
 10
 If Japonica Partners is successful in obtaining an active role in the management and/or control of the Company, Japonica Partners intends to conduct a detailed review and analysis of the Company. Following such review and analysis, Japonica Partners will consider what actions would be desirable in light of the information then available to Japonica Partners and circumstances which then exist. Such actions could include a going-private transaction, a restructuring of the Company, sales of certain of the Company's assets and changes in the articles of incorporation, by-laws, capitalization, board of directors, management and dividend policy of the Company. Japonica Partners has no definitive plans or proposals with respect to the foregoing.
 
 
 11
 Japonica's Schedule 13D, Item 4, app. at 13-14.
 
 
 12
 Japonica further indicated in its 13D its reasons for seeking control: the existence of a "value gap" between the prerumor market price of CNW's common stock and the "potential" value of those shares. App. at 14. Japonica did not, however, append to its 13D filing the Project Eagle books prepared in January and February. Nor did Japonica initially append the limited partnership agreements.
 
 
 13
 On March 16, 1989, Kazarian filed a Schedule 14B regarding the solicitation of proxies to elect Japonica's candidates for CNW's board at the annual shareholders meeting on May 16.[5] The information contained in the Schedule 14B was largely duplicative of that furnished on the 13D. In response to Item 3(e)'s request to "name the parties to" any "contract, arrangements or understandings with respect to any securities of the registrant" to which a participant was a party, the filing mentioned only an arrangement between Japonica and H. Comet regarding a 1988 proxy contest involving CNW.
 
 
 14
 CNW responded with alacrity. On March 16, it filed a complaint seeking permanent injunctive relief and a motion for a preliminary injunction in the United States District Court for the District of Delaware. CNW's motion requested the district court to (1) enter an order requiring Japonica to file an amended Schedule 13D "disclosing Project Eagle and attaching as exhibits ... copies of all documents whose disclosure is required by Section 13(d) of the [1934 Act]," app. at 739; (2) require Michael Lederman to disclose the information required by Items 2 through 6 of Schedule 13D; (3) enjoin Japonica from buying, selling, transferring, or assigning any CNW stock for 30 days after the amended 13D's were filed; and (4) enjoin Japonica from voting its shares at the May 16 shareholders meeting.[6]
 
 
 15
 CNW's complaint, as amended on March 28, claimed that the appellees had failed to comply with the disclosure required by Secs. 13(d) and 14(a) of the 1934 Act and the regulations promulgated thereunder. First, CNW charged that Japonica had definitive "plans," app. at 652, for CNW embodied in written materials that were circulated to potential investors but not appended to its 13D; that Japonica's statement in its 13D that it had no "definitive plans or proposals," app. at 651, as to CNW was therefore false and misleading; that Japonica's existing statements as to the purposes of its acquisition were "deliberately vague and evasive as to its true plans and purposes," app. at 654; and that Japonica had thus failed to comply with item 4 of Schedule 13D requiring it to disclose "the purpose or purposes of the acquisition," thereby violating Sec. 13(d) of the 1934 Act.
 
 
 16
 Second, CNW charged that Item 7 of Schedule 13D required Japonica to include the limited-partnership agreements in its filing, that Item 6 also required it to name the parties to such and other contracts between Japonica and other persons "with respect to any securities of the issuer," and that Japonica's failure to do so therefore violated Sec. 13(d).
 
 
 17
 Third, CNW charged that Japonica's 14B was in violation of Sec. 14(a) because it failed to disclose "contracts, arrangements, or understandings with respect to CNW stock between Japonica and other persons," app. at 659, during the prior year, as required by Item 3(e) of Schedule 14B.
 
 
 18
 On April 7, Japonica amended its Schedule 13D to include copies of the limited-partnership agreements, but it redacted the names of all of the limited partners. On April 14, after an expedited briefing and discovery schedule, the district court denied CNW its preliminary injunction and refused injunctive relief pending appeal. In so ruling, the court found that CNW was unlikely to succeed on the merits on any of its counts. Accordingly, the district judge found it unnecessary to examine whether CNW had met its burden in showing that it would be irreparably harmed if relief were not granted, whether others would be harmed by the grant or denial of a preliminary injunction, and whether the public interest would be served by granting one.
 
 
 19
 The court first found that the January and February Project Eagle books did not constitute a "plan" within the meaning of item 4 of Schedule 13D. Rather, the books were "no more than an assembly of hypotheses based on publicly available information[;] contingent plans dependent upon assumed, but speculative, conditions." Tr. of District Court Ruling at 14. The district court further noted that the books contained many possible scenarios, some of them mutually exclusive, and that no single one of them appeared to be an "ultimate" plan.
 
 
 20
 Next, the district judge dealt with the disclosure of the limited partners' names under Schedule 13D. The court noted that, in regards to limited partnerships, General Instruction C of 13D requires the disclosure of all the information asked for in Items 2 through 6 by "each partner who is denominated as a general partner or who functions as a general partner of ... [a] limited partnership." Rejecting CNW's assertion to the contrary, the district judge found that a limited partner "functions as a general partner" only when that limited partner has "control." Citing the SEC's definition of control (the "possession, direct or indirect, of the power to direct or cause the direction of ... management and policies," 17 C.F.R. Sec. 240.12b-2 (1988)), the district court concluded that the limited partners' power to veto the commencement of a tender offer "is not the power to direct but merely the power to prevent," which does not constitute "control." The court then stated that "current case law indicates that the names of limited partners who entered into contracts with the general partner do not have to be disclosed." Tr. of District Court's Ruling at 19. The district judge eschewed discussion of Schedule 13D's Item 7, requiring the filing of "agreements ... relating to ... the acquisition of issuer control," and Item 6, which requires the filing person to name persons with whom it has "contracts ... with respect to any securities of the issuer."Having concluded that Schedule 13D does not require the disclosure of limited partners' identities, the court stated that requiring such disclosure on a Schedule 14B "would be to graft an inconsistency onto the Williams Act without furthering any of the Act's purposes." Tr. of District Court's Ruling at 25. The court did not address itself to the language in Item 3(e) of Schedule 14B, which requires a filing person to "name the parties" to "any contract, arrangements or understandings with any person with respect to any securities of the registrant" within the year preceding the filing.
 
 
 21
 In addition, the district court rejected CNW's contention that Japonica disclose an agreement it had with Phoenix Capital Markets, Inc. The court noted that the record only suggested that Phoenix Capital was acting as Japonica's broker, and that federal securities laws do not require the disclosure of brokerage agreements. Finally, the district court concluded that disclosure of the coinvestor agreements and the identities of the coinvestors would not be material since they had been terminated as of March 1, 1989.
 
 II.
 
 22
 With respect to the district court's refusal to enter a preliminary injunction ordering Japonica to disclose its Project Eagle books, its analysis reflects no error of law and we find no abuse of discretion. We reach the same conclusion with respect to the district court's refusal to order disclosure of the Phoenix Capital partnership agreement. We further conclude, however, that the district court committed an error of law in its application of section 14(a) in the context of the limited-partnership and coinvestor agreements. Because we conclude that disclosure of the identity of the limited partners and of the content of coinvestor agreements is required by section 14(a), we have no occasion to address the section 13(d) issues or whether CNW has standing to assert a section 13(d) claim.
 
 
 23
 Our analysis of CNW's section 14(a) claim is straightforward. Item 3(e) of Schedule 14B required Japonica to state whether it was, or had been within the last year, "a party to any contracts, arrangements, or understandings with any person with respect to any securities of the registrant [CNW]" and to "name the parties to such contracts, arrangements, or understandings and give the details thereof." 17 C.F.R. Sec. 240.14a-102. Japonica's limited partnership agreements were concededly entered into for the sole purpose of acquiring CNW common stock and they are thus "contracts ... with respect to" the common stock of CNW. Accordingly, Japonica violated section 14(a) when it filed its Schedule 14B without disclosing the content of the limited-partnership agreements and it remained in violation of that section when it filed copies of those agreements with the names of the limited partners redacted.
 
 
 24
 Similarly, the coinvestor agreements were agreements with respect to the common stock of CNW to which Japonica had been a party within the past year. Accordingly, its failure to disclose the parties to those agreements and the "details thereof" also violated section 14(a).
 
 
 25
 Japonica acknowledged before us both that it is a party to the limited partnership agreements and that those agreements are "contracts with respect to any securities" of CNW within the meaning of Item 3(e). Its argument is that the SEC has interpreted Schedule 14B as absolving a participant in a proxy contest from having to disclose the identity of any limited partner in a partnership formed for the purpose of acquiring securities of the registrant so long as that limited partner does not exercise control with respect to the participant. The foundation for this argument is a rule change recently proposed by the SEC that would require identification of "significant equity participants" even in the absence of evidence of control. Japonica insists that such a change would not be necessary if the current rules required disclosure of the parties to its limited partnership agreements. It relies, in particular, on the following portion of the SEC's discussion of the proposed change:Instruction 2 to Schedule 14B specifies that the information shall be given for each partner, officer, and director of a partnership, corporation or other business entity, and each person controlling such entity who is not a participant. Although this instruction does not distinguish between general and limited partners, the instruction has been construed consistently with Instruction C of the other schedules.[7]
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 It has become a common practice to use limited partnerships, similar closely-held entities, or groups of such entities to raise the capital to finance and conduct the acquisition of corporate control. Under the current regulatory framework, the acquiring entity is the person required to comply with the applicable disclosure provisions rather than the persons actually financing, benefiting from and, in some instances, structuring the transaction. These persons (collectively, "substantial equity participants") directly or indirectly may contribute significant capital or be entitled to receive a significant interest in the profits or assets, including shares of the acquired entity, upon liquidation or dissolution of the filing entity. The items to the schedules, however, do not require disclosure concerning substantial equity participants, as such, because the current regulations elicit disclosure only from persons acting in an express or de facto control relationship with the acquiring entity.
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 Although absent an actual control relationship additional disclosure may not be required under the current rules, information about significant equity participants and the terms and conditions of their participation may be material to shareholders and the market. In many instances, the mere agreement to provide a significant equity contribution to a transaction may provide a form of implicit control or potential influence that may be difficult to quantify, describe, or define. Moreover, upon liquidation or dissolution of the filing entity or group, equity participants could become beneficial owners of a significant block of the acquired issuer's stock, without any prior disclosure of these persons' identities, backgrounds, or plans and proposals for the issuer.
 
 
 32
 54 Fed.Reg. 10362 (March 13, 1989) (footnotes omitted).
 
 
 33
 The proposed rule change would amend Instruction 2 of Schedule 14B so that it would track the text of Instruction C to Schedule 13D and would add the following to both Instruction 2 and Instruction C:
 
 
 34
 If the person filing the statement is other than a natural person and does not have a class of equity securities registered under Section 12 of the Act, or if the statement is filed by a group that includes such entities, in addition to the information required above, information for Items 2-6 inclusive, shall be provided for each person who contributes more than 10 percent of the equity capital, or has a right to receive in the aggregate, directly or indirectly, more than 10 percent of the profits, or upon dissolution or liquidation, 10 percent of the assets of that person or group. Such disclosure shall be required notwithstanding the absence of a control relationship.
 
 
 35
 54 Fed.Reg. 10365 (March 13, 1989).
 
 
 36
 We do not attribute to the proposed change and the SEC discussion of it all that Japonica does. The "items" on Schedules 13D and 14B set forth the information that the filer must supply, e.g., "State ... your name and business address" (Schedule 14B, Item 2), "State the amount of each class of securities of the registrant which you own beneficially" (Schedule 14B, Item 3(a)), "State whether ... you are ... a party to any contract ... with respect to any securities of the registrant" (Schedule 14B, Item 3(e)). Instructions C and 2 of those schedules stipulate the entities and persons, in addition to the filer, with respect to whom the information required by each item must be supplied when the filer is not a natural person. Their effect is to expand the information required to be disclosed by increasing the number of entities and persons with respect to whom the filer must supply a name, the amount of securities of the registrant held, the details of contracts with respect to such securities to which such entity or person is a party, and other information. Contrary to Japonica's argument, the effect of these instructions is not to restrict the information that the filer must supply with respect to itself.
 
 
 37
 The proposed rule change would provide that the information required in the specified "items" be supplied with respect to "significant equity participants," as well as with respect to general partners of the filer and controlling persons. It would not alter the information that must be supplied with respect to the filer. Accordingly, the perceived need for the proposed change does not indicate to us that, in the context of this case, Item 3(e) means anything less than what it clearly says on its face.
 
 
 38
 The distinction between information with respect to the filing person and the information required by Instructions 2 and C with respect to others is expressly reflected in the SEC's discussion of the proposed change. While the Commission points out that the current version of Instruction C does not require information with respect to a limited partner having no control, it is careful to note that the identity of such a limited partner must be provided under the current regulations when that information comes within the scope of the information the filer must provide with respect to itself. Thus, the Commission expressly notes the following with respect to a limited partner who is a "significant equity participant":
 
 
 39
 The identification of significant equity participants and certain additional information currently may be required under circumstances pursuant to specific items of the schedules. For example, Item 6 to the Schedule 13D requires the filing person to describe "any contracts, arrangements, understandings or relationships (legal or otherwise) among the persons named in Item 2 and between such persons and any person with respect to any securities of the issuer ... naming the persons with whom such contracts, arrangements, understandings or relationships have been entered into." Item 7 requires that there be filed as an exhibit copies of all written agreements, contracts, arrangements, understandings, plans or proposals relating to the borrowing of funds or the acquisition, liquidation, sale of assets, merger, or change in business or corporate structure of the issuer. This item would require the filing, as an exhibit, of limited partnership agreements and any offering memoranda used to syndicate limited partnership interests in the filing person if the memoranda constitute a plan or proposal relating to these matters. Items 7 and 11, respectively, elicit similar disclosure in the Schedule 14D-1.
 
 
 40
 54 Fed.Reg. 10363 n. 24 (March 13, 1989).
 
 
 41
 It follows that even if Instruction 2 is to be "construed consistently with Instruction C," as suggested in the SEC's discussion, this does not help Japonica. Item 3(e) requires that it state the parties to, and details of, any agreement that it (Japonica) has with respect to the securities of CNW. Since the limited partnership agreements are concededly agreements that Japonica itself has entered into for the sole purpose of acquiring common stock of CNW, the "parties" thereto and the "details thereof" must be disclosed.[8]
 
 
 42
 With respect to the coinvestor agreements, the district court considered it significant that they were no longer in existence and had been superseded by limited partnership agreements that had been filed, albeit in redacted form. Given that Item 3(e) called for Japonica to disclose any agreement with respect to CNW stock that it was a party to during "the past year," we see no material distinction between the coinvestor agreements and the limited-partnership agreements.
 
 
 43
 For these reasons, we hold that the district court erred as a matter of law in concluding that CNW had little or no likelihood of success on its section 14(a) claim. Japonica will be in violation of section 14(a) so long as the identities of the limited partners and the coinvestor agreements remain undisclosed, and the district court must take that fact into account in determining what, if any, pendente lite relief is appropriate based on the circumstances as they exist upon the issuance of this opinion. The order of the district court denying interim relief will be vacated. The injunction of this court shall remain in effect until modified or vacated by order of the district court. The mandate will issue forthwith.
 
 
 
 [1]
 Because Japonica has not revealed the identities of the various limited partners, the number of individuals or entities is not indicated in or inferable from the record
 
 
 [2]
 The limited-partnership agreements further provide that each partnership can be dissolved at any time at the discretion of the general partner, and after January 1, 1990, at the discretion of the limited partner. See Appendix to Reply Brief in Support of Plaintiff's Motion and Supplemental Motion for a Preliminary Injunction at 593. In the event of a dissolution of a limited partnership, the assets are to be distributed to the limited partners after payments are made to, inter alia, creditors of the partnership. See id. at 594
 
 
 [3]
 CNW asserted that the coinvestor plans were "converted" into limited partnership agreements, and the district court apparently assumed arguendo that such was the case. The record only indicates that the January and February coinvestor agreements were terminated on the same day the limited-partnership agreements came into effect, March 1, 1989. The record also indicates that Kazarian did not engage in any sales of CNW stock during the sixty days preceding his 13D filing on March 13. See app. at 16, 20-21. Because Japonica's fourth amendment to its 13D indicates that the Phoenix, Botanic, and Pigeon partnerships received "certain" shares from their respective limited partners, one could infer that the coinvestors became limited partners in those partnerships, and that some or all of the shares purchased pursuant to the coinvestor agreements were turned over to one or more of the Phoenix, Botanic, or Pigeon partnerships. Since the identities of the coinvestors and limited partners are not available, however, other conclusions are possible. The coinvestors, for example, might have retained their shares upon the termination of the coinvestor agreements
 
 
 [4]
 Section 13(d)(1) of the 1934 Act, 15 U.S.C. Sec. 78m, which was added by the Williams Act, provides in relevant part:
 Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 781 of this title ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security ..., send to each exchange where the security is traded, and file with the [SEC], a statement containing such of the following information, and such additional information, as the [SEC] may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors....
 
 
 [5]
 Section 14(a) of the 1934 Act, 15 U.S.C. Sec. 78n(a), makes it unlawful to solicit proxies in respect of certain securities when such solicitation contravenes rules promulgated by the SEC. Section 240.14a-11(c)(1) of 17 C.F.R. ch. II provides:
 No solicitation [of proxies] subject to this section shall be made by any person other than the registrant unless at least five business days prior thereto, or such shorter period as the Commission may authorize upon a showing of good cause therefor, there has been filed, with the Commission and with each national securities exchange upon which any security of the registrant is listed and registered, by or on behalf of each participant in such solicitation, a statement in triplicate containing the information specified by Schedule 14B.
 
 
 [6]
 In CNW's reply brief presented to this court, and at oral argument, CNW indicated that it no longer seeks to enjoin Appellees from voting their shares on May 16 or for the "cooling off" period originally requested. Reply Br. of Appellants at 22
 
 
 [7]
 Instruction 2 to Schedule 14B provides:
 
 
 [2]
 If the participant is a partnership, corporation, association or other business entity, the information called for by Items 2, 3 and 4(b) and (c) shall be given with respect to each partner, officer and director of such entity, and each person controlling such entity, who is not a participant
 Instruction C to Schedule 13D provides:
 C. If the statement is filed by a general or limited partnership, syndicate, or other group, the information called for by Items 26, inclusive, shall be given with respect to (i) each partner of such general partnership; (ii) each partner who is denominated as a general partner or who functions as a general partner of such limited partnership; (iii) each member of such syndicate or group; and (iv) each person controlling such partner or member. If the statement is filed by a corporation or if a person referred to in (i), (ii), (iii) or (iv) of this Instruction is a corporation, the information called for by the above mentioned items shall be given with respect to (a) each executive officer and director of such corporation; (b) each person controlling such corporation; and (c) each executive officer and director of any corporation or other person ultimately in control of such corporation.
 
 
 [8]
 We note that this is not a case involving a contract between a participant and a limited partnership formed for general investment purposes whose limited partners are truly passive investors. As we have noted, Japonica acknowledges in its Schedule 13D filing that the limited partnerships were formed for the purpose of acquiring CNW stock