ICN PHARMACEUTICALS, INC. and Viratek, Inc., Plaintiffs–Appellees,

v.

Rafi KHAN, Defendant–Appellant.

Rafi KHAN, Counter–Complainant,

v.

ICN PHARMACEUTICALS, INC., a Delaware Corporation; Milan Panic, an individual; Roberts A. Smith, Ph.D., an individual; Adam Jerney, an individual; Norman Barker, Jr., an individual; Robert Finch, an individual; Birch E. Bayh, an individual and Richard Starr, an individual, Counterclaim–Defendants.

1905, Docket 93–7480.

United States Court of Appeals, Second Circuit.

Argued June 14, 1993.

Decided Aug. 25, 1993.

Michael Lesch, New York City (Robert J. Hasday, David S. Tannenbaum, Stephen Lew, Regina L. LaPolla, Shea & Gould, of counsel), for defendant-appellant.

Arnold I. Burns, New York City (Charles S. Sims, Eric R. Levine, Daniel A. Seff, Eric C. Rosenbaum, Mitchell C. Shelowitz, Proskauer Rose Goetz & Mendelsohn, of counsel), for plaintiffs-appellees.

Before: CARDAMONE and MAHONEY, Circuit Judges, and PARKER,* District Judge.

MAHONEY, Circuit Judge:

Defendant-appellant Rafi Khan appeals from a preliminary injunction entered May 20, 1993 in the United States District Court for the Southern District of New York, John E. Sprizzo, Judge, that: (1) barred Khan from proceeding with his effort to replace the board of directors of plaintiff-appellee ICN Pharmaceuticals, Inc. ("ICN") by consent solicitation or any other means; although it (2) allowed Khan to file consent solicitation materials with the Securities and Exchange Commission (the "SEC"), provided that such materials are cleared with ICN and plaintiff-

---

* The Hon. Fred I. Parker, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

appellee Viratek, Inc. ("Viratek"), and the district court, prior to such filing.

Vacated and remanded.

### Background

This action arises out of a complaint filed by ICN and Viratek in the United States District Court for the Southern District of New York on April 5, 1993 following Khan's April 1, 1993 delivery to ICN, and filing with the SEC, of a written consent for shareholder action (the "Consent Statement"), pursuant to Del.Code Ann. tit. 8, § 228 (1991), that sought the authorization of ICN's shareholders to replace the board of directors of ICN. At the time of the filing, Khan owned 120,000 shares, and other members of his family owned approximately 180,000 additional shares, of ICN common stock. Khan's 120,000 shares constituted less than one percent of the total ICN shares issued and outstanding as of September 30, 1992. ICN's brief on appeal represents that ICN now has outstanding approximately 20,000,000 shares of common stock.

ICN is a Delaware corporation with its principal place of business in Costa Mesa, California. It is a holding company for, and owns approximately seventy percent of the common stock of, Viratek, also a Delaware corporation with its principal place of business in Costa Mesa. SPI Pharmaceuticals, Inc. ("SPI"), another ICN subsidiary, markets drugs manufactured by Viratek. The most important asset of ICN and its subsidiaries is Virazole, a drug owned and developed by Viratek. Virazole is currently in the final stages of testing for use as a treatment for Hepatitis C, but has not yet received approval by the Food and Drug Administration for this use.

The complaint alleged, *inter alia*, that Khan, at all relevant times a securities broker employed by H.J. Meyers & Co., Inc. ("H.J. Meyers"), used confidential information that he obtained in connection with a public offering of Viratek common stock and warrants underwritten by H.J. Meyers to persuade a group of investors with substantial holdings of ICN common stock (the "Group") to (1) increase their holdings in ICN, and (2) seek to effectuate a change in control of ICN and its subsidiaries. The complaint charged that the alleged disclosure of inside information by Khan to the Group, and his acting in concert with the Group, violated both Khan's fiduciary obligations to ICN and various provisions of the federal securities laws, and constituted an unlawful civil conspiracy. The complaint sought the following primary relief: (1) a declaration that the Consent Statement and related shareholder solicitation were null and void *ab initio;* (2) a permanent injunction barring Khan and all persons and entities acting in concert or participation with him from voting any shares of stock of ICN and its subsidiaries, acquiring any such shares, soliciting proxies to vote such shares, or otherwise attempting to control, affect, or change the management of ICN and its subsidiaries, both unconditionally and until such time as corrective Schedule 13D filings were made with the SEC and the effects of prior misrepresentations and nondisclosures were dissipated; (3) disgorgement of "Khan's unjust enrichment;" (4) $25,000,000 in compensatory damages; (5) punitive damages; and (6) costs and attorney fees.

Khan filed an answer to the complaint that substantially denied its allegations and set forth a number of affirmative defenses, including failure to state a claim upon which relief might be granted and the lack of irreparable injury to ICN and Viratek. Khan also filed a counterclaim against ICN and members of ICN's board of directors alleging (1) breaches of fiduciary duty to ICN, (2) slander, and (3) intentional interference with economic relations.

On April 14, 1993, the district court entered a temporary restraining order that enjoined Khan from soliciting proxies or consents and from taking any action with respect to the Consent Statement until at least the conclusion of a pending hearing upon an application by ICN and Viratek for a preliminary injunction. The district court conducted evidentiary hearings on April 13, 14, 20, and 22, 1993. A number of witnesses testified, including: (1) David C. Watt, senior vice president, general counsel, and secretary of ICN; (2) Adam Jerney, executive vice president and chief operating officer of ICN and

president of SPI; (3) Jack Scholl, senior vice president of public relations for SPI; (4) William MacDonald, executive vice president of corporate development and taxes for ICN and senior vice president of corporate development of SPI; (5) John Phillips, executive vice president and chief financial officer of SPI; (6) Seth M. Glickenhaus, an investment banker and manager and senior partner in Glickenhaus & Company; (7) Khan; and (8) Timothy John Tyrell, a securities broker and one of Khan's former colleagues at H.J. Meyers.

The hearing testimony set forth the following course of events. On or about August 24, 1992, Viratek and H.J. Meyers entered into a letter of intent regarding the public offering of 1.375 million units, each consisting of a share of Viratek common stock and a warrant to purchase another share (the "Offering"). A major purpose of the Offering was to raise capital for the development of Virazole. H.J. Meyers was to serve as the lead underwriter for the Offering, which was to be made on a "firm commitment" basis.

In October 1992, Khan and Jerney travelled to New York, Boston, Columbus, and Denver to meet with ICN's major institutional investors. The chief purpose of the trip was to introduce Jerney to the institutional investors. Jerney had recently become the chief executive officer of ICN, replacing Milan Panic upon Panic's leave of absence from ICN in July 1992 to serve as prime minister of the Federal Republic of Yugoslavia.[1]

Jerney testified that in a meeting preparatory to this trip, he provided Khan with significant nonpublic information regarding ICN and its subsidiaries. Khan denied that this occurred. Jerney specifically testified that he and Khan discussed the forthcoming Offering at that meeting. Khan testified, on the contrary, that he was unaware of the Offering at the time of the October trip with Jerney, and that he was never aware of the Offering prior to its public announcement on November 18, 1992.[2]

That announcement by Viratek was coupled with the filing of an initial prospectus with the SEC. Subsequently, during the first half of January 1993, Khan and various members of ICN management travelled to various cities within the United States to meet with institutional investors in order to generate interest in the Offering. Khan testified that the issue of FDA approval of Virazole was a central topic of discussion at these meetings, but denied that he possessed, or conveyed to those present, nonpublic information concerning preliminary results of the Virazole tests.

Shortly thereafter, Khan called on Jerney at ICN's offices in Costa Mesa to introduce its management to an institutional investor potentially interested in purchasing shares of ICN. Following the meeting with the investor, Khan asked to speak with Jerney privately. Jerney testified that Khan stated

> he was very unhappy with Mr. Panic and Mr. Panic's role, and he was very unhappy, he and the group of shareholders that he represented, ... which he said was more than 50 percent, were very unhappy with some of our directors.
>
> At the same time he said that they were happy with my performance at the leadership of [ICN] and he tried to set a date for an appointment for a luncheon meeting, and he said that it should take place as early as possible, ... because ... they had in mind to make certain changes, and he felt that he had the control, the interest in the company to make those changes happen, and it was up to me to decide whether I am on their side or on whose side I am.

The Offering became effective on January 28, 1993, and Khan placed approximately one million of the total 1.375 million units with clients maintained by him through H.J. Meyers. Khan earned approximately $300,000 in commissions from these sales.

On February 10, 1993, Khan attended a lunch with Jerney, Watt, and MacDonald in Costa Mesa. At the lunch, Khan again ex-

---

**1.** In March 1993, Panic returned to the United States and reassumed the position of chief executive officer of ICN.

**2.** MacDonald testified that in January 1992 he provided Khan with material inside information regarding ICN's plans for a joint venture in Russia. Khan alternatively denied the disclosure and denied its materiality.

pressed dissatisfaction with Panic, as well as three other ICN directors, asserted that they should be replaced by four independent directors, including Khan, and claimed that he had the support of shareholders representing a majority of ICN's voting stock for such a change of control. Specifically, the court credited Jerney and MacDonald's testimony that Khan (1) named a number of institutional investors, including Glickenhaus & Co., who collectively owned over fifty percent of the voting shares of ICN, and who supported his effort to install new directors; and (2) asserted that some of these supporters would fund legal costs needed to effectuate the change. Glickenhaus, however, denied being part of any concerted effort to effect a change of control in ICN, although he conceded that he had been harshly critical of Panic in conversations with Khan, and had indicated a willingness to support any reasonable alternative to a Panic slate of directors.

The Consent Statement disclosed that Khan had made continuous purchases and sales of ICN common stock and related options from December 1991 to February 1993. Khan conceded that there typically existed a close relationship between the trading price of the common stocks of ICN and Viratek.

On May 13, 1993, after hearing oral argument on the motion for a preliminary injunction, the district court issued a bench ruling. The court found that any employee of H.J. Meyers who participated in the underwriting of the Offering had fiduciary obligations to ICN, and that although it was a question of first impression, these obligations should bar such an employee from participating in a takeover of ICN. The court further found that "Khan should be charged with the responsibilities of an underwriter with the fiduciary duties attaching thereto" because, contrary to Khan's testimony, Khan had knowledge of the Offering before it was publicly announced. Based upon Khan's demeanor, internal inconsistencies in his testimony, and the contradictory testimony of other witnesses, the court found Khan's testimony on this issue "incredible[,] ... false and wilfully false."

The court further found many material nondisclosures in the Consent Statement, the "most important of which" were the failure to disclose that: (1) a change of management would authorize certain ICN bondholders to demand payments that could render ICN insolvent; (2) Khan represented the Group, which was financing his effort to take control of ICN; and (3) Khan had traded on inside information in connection with that effort. The court added that "any future filings that are going to be made consistent with the Court's fact findings made today ... should be cleared with the plaintiff and with the Court before they are issued so that we will avoid future litigation over the adequacy or nonadequacy of these disclosures."

The district court then ruled that a preliminary injunction should issue to prohibit Khan "directly or indirectly, or anyone acting on his behalf or with him" from effecting a change of control of ICN. The court also stated that it would direct "mandatory injunctive relief requiring at least the disclosures I have referred to in my findings of fact, ... which include the Court's preliminary finding that Mr. Khan's testimony was untruthful and willfully so."

A preliminary injunction was then entered that barred Khan from "proceeding with his effort to replace the board of directors of [ICN] by consent solicitation or any other means." The injunction nonetheless allowed Khan to file consent solicitation materials with the SEC, provided that "such materials, or any other materials required by law to be filed with the SEC in connection with any attempt to effect a change of control of [ICN] by consent, proxy or otherwise, are cleared with plaintiffs and the District Court before they are issued."

This appeal followed. Khan sought a stay of the preliminary injunction pending appeal. The stay was denied on the conditions that: (1) ICN and Viratek "not take any steps other than in the normal course of business pending the disposition of the appeal;" and (2) a forthcoming ICN shareholders meeting be deferred pending decision of the appeal. The appeal was expedited.

## Discussion

■ Khan does not challenge the district court's rulings that the Consent Statement failed to make material disclosures. It is accordingly clear that, at a minimum, his efforts to take control of ICN may be enjoined pending correction of these nondisclosures. *See, e.g., CNW Corp. v. Japonica Partners, L.P.*, 874 F.2d 193, 194, 200–01 (3d Cir.1989); *Kaufman v. Cooper Cos.*, 719 F.Supp. 174, 185–86 (S.D.N.Y.1989); *Camelot Indus. Corp. v. Vista Resources, Inc.*, 535 F.Supp. 1174, 1184–85 (S.D.N.Y.1982); *Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F.Supp. 787, 794 (S.D.N.Y.1978).

■ In addition, the district court determined, in effect, that the Group owned a potentially controlling share of ICN's common stock and was collaborating with Khan in an effort to oust ICN's board of directors. Although the court's preliminary injunction did not specifically address the issue, such a situation requires Schedule 13D filings with the SEC pursuant to Section 13(d)(1) and (3) of the Securities and Exchange Act of 1934, (the "Exchange Act"), 15 U.S.C. § 78m(d)(1) and (3) (1988),[3] and 17 C.F.R. § 240.13d–1(a) (1992).[4] Any effort to change or affect control of ICN may be enjoined pending the completion of required Schedule 13D filings. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 96–97 (1st Cir.1977) (collecting cases).

When, however, a corrective filing is made and adequate opportunity is provided for the information that it contains to be digested by shareholders, the corrective injunction should be terminated. As we stated in *Treadway*

*Cos. v. Care Corp.*, 638 F.2d 357 (2d Cir. 1980):

> [A]n injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect. *Rondeau v. Mosinee Paper Corp.*, [422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975)]. Those interests are fully satisfied when the shareholders receive the information required to be filed. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir.1977).

638 F.2d at 380; *see also Hibernia Sav. Bank v. Ballarino*, 891 F.2d 370, 373 (1st Cir.1989); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 214–15 (2d Cir. 1973). In this case, Khan contends that the district court impermissibly banned him permanently from attempting to take control of ICN because he breached his fiduciary obligations to ICN as an underwriter.

While we could simply affirm the issuance of a preliminary injunction on the basis of the uncontested nondisclosures, it seems appropriate to address this contention, which will certainly be advanced on remand. *See Romano v. Howarth*, 998 F.2d 101, 107 (2d Cir.1993) (addressing evidentiary issue that would "most certainly be revisited" at new trial that court ordered); *Maresco v. Evans Chemetics*, 964 F.2d 106, 113 (2d Cir.1992) (issue addressed "in the interest of facilitating disposition of the case upon remand"); *In re Koreag, Controle et Revision S.A., (Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.)*, 961 F.2d 341, 351 (2d Cir.) (same), *cert. denied*, —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). In addition, we

---

**3.** Section 13(d) provides in pertinent part:

(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title ... is directly or indirectly the beneficial owner of more than five per centum of such class shall, within ten days after such acquisition, send to the issuer ..., send to each exchange where the security is traded, and file with the Commission a statement containing such ... information ... as the Commission may by rules and regulations, prescribe....

. . . .

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purposes of acquiring, hold-

ing, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for purposes of this subsection.

**4.** Section 240.13d–1(a) provides in pertinent part:

Any person who, after acquiring directly or indirectly the beneficial ownership of any [specified] equity security ... is directly or indirectly the beneficial owner of more than 5 percent of such class shall, within 10 days after such acquisition, send to the issuer of the security ... and to each exchange where the security is traded, and file with the Commission, a statement containing the information required by Schedule 13D (§ 240.13d–101).

will consider Khan's arguments that the district court erred in directing that: (1) any materials required to be filed by Khan with the SEC in connection with any attempt to effect a change of control of ICN be precleared with ICN, Viratek, and the district court; and (2) any such filing disclose the court's preliminary determination that Khan's testimony was willfully false.

■ These questions arise in the context of our review of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1) (1988). A party is entitled to a preliminary injunction only if it establishes: "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989) (citing *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). We review a district court's grant or denial of a preliminary injunction under an abuse of discretion standard. *Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 94 (2d Cir.1993); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992) (citing *Doran v. Salem Inn,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975)). "Abuse of discretion can be found if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law." *Nikon,* 987 F.2d at 94 (citing *Bristol–Myers,* 973 F.2d at 1038). In this case, Khan challenges several of the district court's applications of the law, as we have specified.

### A. The "Permanent" Ban on Khan's Participation in a Takeover of ICN.

It is not totally clear on this record whether the district court intended to subject Khan to a permanent ban against participating in a takeover of ICN, but our overall impression is that this was the substance of the court's ruling. At several junctures in the hearing on the preliminary injunction, the district court posed the issue whether Khan should be subjected to a permanent ban against participation in a takeover of ICN because of a breach of fiduciary duties that he owed ICN as an underwriter, or only a ban pending corrective disclosure. The court's bench ruling states clearly that participation by Khan in such an effort at any time would constitute irreparable injury to ICN, but then adds that Khan's foreknowledge of the Offering imposed upon him "a fiduciary responsibility to the company which forecloses him *at this point in time* [emphasis added] from seeking to effect a change of management and to benefit himself personally thereby." Further, the preliminary injunction explicitly envisions future takeover filings by Khan with the SEC regarding ICN, which would be pointless if he was permanently barred from such an undertaking.

■ In any event, it seems clear to us that a permanent, as distinguished from corrective, ban against participation in a takeover should rarely, if ever, be imposed because of securities law violations, and certainly only as a last resort. *See San Francisco Real Estate Investors v. Real Estate Inv. Trust of America,* 701 F.2d 1000, 1010 (1st Cir.1983) ("We ... recogniz[e] that an injunction forbidding an acquisition is not, except in the most egregious cases, the preferred or even proper remedy."). We premise this conclusion upon the central themes of the federal securities laws concerning regulation of contests for corporate control, which are (1) full disclosure, and (2) a level playing field that does not unduly advantage either incumbent management or its challenger.

Thus, the Supreme Court has repeatedly said: " 'The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.' " *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985) (quoting *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)). A similar rationale underlies the regulation of proxy contests. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (citing legislative history of Exchange Act § 14(a), at 15

U.S.C. § 78n(a) (1988)). Further, the Court has made it unmistakably clear that there is no additional legislative purpose to provide any special advantage or "edge" to incumbent management:

> By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." S.Rep. No. 550, 90th Cong., 1st Sess., 3 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess., 4 (1968). *See also Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (CA2 1969).

*Rondeau,* 422 U.S. at 58–59, 95 S.Ct. at 2076.

These policies militate against injunctive remedies, such as a permanent ban against a takeover, that go beyond correction of past violations and unduly favor incumbent management. More general restraints upon injunctive relief also suggest a cautious approach. " 'The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.' " *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir.1969) (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944)); *see also Rondeau,* 422 U.S. at 60–61, 95 S.Ct. at 2077; *Thompson v. Edward D. Jones & Co.,* 992 F.2d 187, 189 n. 2 (8th Cir.1993) (order enforcing injunction must be narrowly tailored to remedy specific harm shown); *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1542 (2d Cir.) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

In this case, however, it is clear that corrective disclosure would not address all the securities law violations that Khan was found to have committed. The district court explicitly concluded, on the basis of factual determinations that are amply supported in the record, that Khan had engaged in illegal inside trading of ICN's common stock. It would certainly fall within the parameters of traditional injunctive relief to preclude Khan from voting any illegally acquired stock in a contest for control of ICN. *See, e.g., General Aircraft Corp.,* 556 F.2d at 97–98 (collecting cases); *Chris–Craft Indus. v. Piper Aircraft Corp.,* 480 F.2d 341, 380 (2d Cir.), *cert. denied,* 414 U.S. 910, 924, 94 S.Ct. 231, 234, 38 L.Ed.2d 148, 158 (1973); *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050, 1063–64 (D.Del.1982). He would ordinarily be entitled, however, to vote prior holdings legally acquired. *See General Aircraft Corp.,* 556 F.2d at 97–98. In a proper case, divestiture of illegally acquired shares might be directed. *See Hanna Mining Co. v. Norcen Energy Resources Ltd.,* 574 F.Supp. 1172, 1202–03 (N.D.Ohio 1982).

In this connection, we have no quarrel with the district court's conclusions that Khan was a statutory underwriter, *see* 15 U.S.C. § 77b(11) (1988); *SEC v. Van Horn,* 371 F.2d 181, 188 (7th Cir.1966); *SEC v. Culpepper,* 270 F.2d 241, 246 (2d Cir.1959), or that in that capacity he had fiduciary obligations to ICN and Viratek. *See Dirks v. SEC,* 463 U.S. 646, 655 n. 14, 103 S.Ct. 3255, 3262 n. 14, 77 L.Ed.2d 911 (1983); *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 279 (2d Cir.1975) ("an underwriter who manages a public distribution of a corporation's shares is a fiduciary of the corporation and may not profit from corporate information gained in its capacity as underwriter") (citing *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 353 F.Supp. 264 (S.D.N.Y.1972), *aff'd,* 495 F.2d 228 (2d Cir.1974)).

It does not follow, however, that because Khan is a fiduciary of ICN and has violated fiduciary obligations to that corporation, he may or should be permanently barred from participating in an effort to take control of ICN. Such a rule would sweep far too broadly. For example, one of the princi-

ple violations attributed to Khan is insider trading. Under the misappropriation theory of insider trading, " 'one who misappropriates nonpublic information *in breach of a fiduciary duty* and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5.' " *United States v. Chestman,* 947 F.2d 551, 564 (2d Cir.1991) (in banc) (emphasis added) (quoting *SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985)), *cert. denied,* — U.S. ——, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *see also United States v. Libera,* 989 F.2d 596, 599 (2d Cir.1993); *United States v. Teicher,* 987 F.2d 112, 119 (2d Cir.1993). Thus, were we to embrace the theory that one who breaches a fiduciary duty to a corporation should be permanently banned from participating in an effort to gain control of it, a vast array of inside traders would fall under this automatic sanction, displacing the more limited remedies of disenfranchisement or compelled divestiture of the tainted shares. This view goes far beyond the settled law in this area, and we decline to adopt it.

■ Finally, we note our agreement with Khan's contention that his duty as a fiduciary is owed to the shareholders of ICN and Viratek, rather than to their incumbent managements. We ruled to that effect regarding corporate directors in *Treadway,* 638 F.2d at 377, and see no substantial basis for a distinction between directors and underwriters. Furthermore, *Dirks* explicitly states that "where corporate information is revealed legitimately to an *underwriter,* accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries *of the shareholders.*" 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14 (emphasis added).

### B. *Preclearance of SEC Filings.*

■ The preliminary injunction requires that any SEC filings by Khan "in connection with any attempt to effect a change of control of [ICN] by consent, proxy or otherwise [be] cleared with plaintiffs and the District Court before they are issued." Presumably, this ruling was not intended to provide ICN and Viratek with any sort of veto power over

such filings. In any event, their counsel consented at oral argument that the injunction be confined to clearance by the district court, a concession that we adopt herein.

The injunction is overbroad even if construed to require only clearance of SEC filings by the district court. Certainly, the Consent Statement and any Schedule 13D filings required by Khan's past activities are currently in litigation before that court, and as a practical matter will require its approval. Once these matters are resolved, however, it seems inappropriate to have any standing rule as to possible future takeover attempts that alters the normally applicable process. Any SEC filings by Khan would be required to be delivered simultaneously to ICN, *see, e.g., supra* notes 3 and 4, and we doubt that ICN will shrink from seeking any judicial relief that might seem warranted. Time is of the essence in these contests, and delay can be a potent weapon favoring incumbent management. *See Edgar v. MITE Corp.,* 457 U.S. 624, 639, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982) (potential for delay can "upset the balance struck by Congress by favoring management at the expense of stockholders"); *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 524 (1st Cir.1991); *Condec Corp. v. Farley,* 573 ˙ F.Supp. 1382, 1387 (S.D.N.Y.1983).

### C. *The "Perjury" Finding Regarding Khan.*

■ As stated *supra,* the district court found Khan's testimony regarding when he learned about the Offering "incredible[,] ... false and willfully false." Although the court made a number of adverse comments on the record regarding Khan's credibility, this was its only specific finding on that issue. A finding of willfully false testimony under oath regarding a material matter indeed amounts to a determination that perjury has been committed. *See* 18 U.S.C. § 1621 (1988). As the district court correctly recognized, it is likely that this finding would become an issue in any future contest for control of ICN in which Khan is involved.

Khan contends that the court's finding that he committed perjury was unnecessary, and further that the court was required to make any such finding on the basis of "clear and

convincing" evidence, but failed to make the necessary specification that it had done so. We regard this contention as addressed only to the district court's assertion that Khan's testimony on this issue was "willfully false," and thus perjurious. The court was obviously entitled, indeed it was obligated, to decide the factual issue presented for its resolution, and accordingly to make credibility determinations as to the relevant, contradictory testimony.

As to the issue of necessity, we ruled in *Penthouse Int'l, Ltd. v. Dominion Fed. Sav. & Loan Ass'n,* 855 F.2d 963, 987 (2d Cir. 1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 154 (1989), that "unless perjury is at issue in a case, such a finding is not necessary once the trier of fact finds the witnesses' testimony incredible." ICN maintains that perjury was at issue before the district court because Khan's integrity as a potential director of ICN was material information to which ICN's shareholders would be entitled in consent or proxy solicitations, citing 17 C.F.R. § 229.401(f) (1992). Nothing in that regulation, however, which addresses discrete categories of relevant legal activity, would call for the disclosure of Khan's false testimony at the preliminary injunction hearing. In any event, the issue presented at this juncture is not what Khan would be required to disclose in his own SEC filings, or for that matter what ICN could say about Khan in its SEC filings, but rather what findings the district court should make in light of our *Penthouse* ruling.

Nothing presented to us on this appeal indicates any necessity for a ruling that Khan's testimony was willfully false and thus perjurious; we accordingly vacate that aspect of the district court's finding. Khan contends that we should not only vacate, but reverse, the district court's finding. We perceive no basis for doing so on this record.

Finally, responding to Khan's other contention on this issue, we note that a finding as to willfully false testimony (as distinguished from an ordinary credibility determination in the course of resolving a disputed issue of fact) must be made in stated accordance with the "clear and convincing proof" standard. *See Penthouse,* 855 F.2d at 987;

*Barr Rubber Prods. Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1120–21 (2d Cir.), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970).

### Conclusion

The preliminary injunction is vacated and the matter is remanded for further proceedings not inconsistent with this opinion. This court's prior directions regarding maintenance of the status quo and deferral of the annual meeting pending appeal are vacated. The parties shall bear their own costs. The mandate shall issue forthwith.