**Joel GERBER, on his own behalf and on behalf of all others similarly situated, Plaintiff–Appellee,**

v.

**COMPUTER ASSOCIATES INTERNATIONAL, INC. and LWB Merge, Inc., Defendants–Appellants.**

**Docket No. 00–9557.**

United States Court of Appeals, Second Circuit.

Argued: May 9, 2002.

Decided: Sept. 04, 2002.

Wayne N. Elliott (James L. Holzman, Paul M. Lukoff, on the brief), Prickett, Jones & Elliott, Wilmington, DE, for Defendants–Appellants Computer Associates International, Inc. and LWB Merge, Inc.

Roger W. Kirby (Joanne M. Cicala, on the brief), Kirby McInerney & Squire, LLP, New York, NY, for Plaintiff–Appellee Joel Gerber.

Before FEINBERG, KEARSE, and B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

This appeal concerns a transaction in which defendant Computer Associates International, Inc. ("CA"), a computer software company, acquired On–Line Software International, Inc. ("On–Line"), another computer software company, by means of a tender offer and follow-up merger. Plaintiff Joel Gerber, an On Line shareholder, commenced a class action in 1991 on behalf of On–Line shareholders who tendered their stock in CA's tender offer. Gerber alleged that, in acquiring On–Line, CA paid more money per share to Jack Berdy, On–Line's chairman and chief executive officer, than it paid to other On–Line shareholders, in violation of various provisions of the Williams Act, 15 U.S.C. §§ 78l(i), 78m(d)-(e), and 78n(d)-(f), and regulations promulgated thereunder, 17 C.F.R. § 240.14d-10.

The United States District Court for the Eastern District of New York (Sterling

Johnson, Jr., *Judge* ) denied defendants' motion to dismiss and granted in part and denied in part their motion for summary judgment. Following trial, a jury returned a $5.7 million verdict for the plaintiff class. Judgment was entered on the verdict, and the District Court (Charles R. Wolle, *Judge,* Southern District of Iowa, sitting by designation) denied CA's motion for judgment as a matter of law or, in the alternative, for a new trial. CA and its wholly-owned subsidiary, LWB Merge, Inc. ("LWB"), appeal, and we affirm.

## BACKGROUND

CA is in the business of designing and marketing computer software products. In July 1991, CA's chairman, Charles Wang, approached the chairman and chief executive officer of On–Line, Jack Berdy, to discuss the possibility of CA's acquiring On Line. On–Line, which Berdy founded in 1969, was also in the software business. Berdy owned 1.5 million shares of On–Line stock, representing approximately 25% of the company's outstanding shares. Berdy and Wang, as well as Sanjay Kumar, the chief operating officer of CA, negotiated extensively over the price that CA would pay for On–Line's stock.

Negotiations over the terms of a non-compete agreement proceeded concurrently with negotiations over the purchase price. CA insisted that Berdy and other On–Line executives, who would be leaving the company following the acquisition, agree not to compete with CA for a specified period of time, but Berdy initially resisted entering into a non-compete agreement. At one point in the negotiations, CA offered to purchase On–Line's stock (which was then trading at approximately $10 per share on the New York Stock Exchange (the "NYSE")) for $14 per share and to pay Berdy $9 million for a seven-year non-compete agreement. On–

Line's Board of Directors felt that CA's offer of $14 per share was too low and that the $9 million offered to Berdy for his agreement not to compete was too high. The On–Line Board sought $16 per share, and the negotiations continued. Negotiations stalled when CA offered $15.50 per share and On–Line insisted on $16. CA and On–Line ultimately agreed that CA would offer to purchase On–Line's stock for $15.75 per share, and that CA would pay Berdy $5 million for a five-year non-compete agreement. The central issue in this litigation is whether the $5 million was compensation for Berdy's non-compete agreement or unlawful additional compensation for his On–Line stock.

On August 15 and 16, 1991, there was an unusually large amount of trading in On–Line stock. On August 15, the stock price rose $1, and the NYSE asked On–Line about the unusual trading activity. On the morning of August 16, when the stock price rose another dollar, On–Line told the NYSE that it was in discussions with CA and that a press release might be issued shortly. Berdy told CA that On–Line was under pressure from the NYSE to issue a press release. Around noon on August 16, On Line and CA reached their agreement at $15.75 per share, On–Line told the NYSE that it would issue a press release, and trading in On–Line stock was halted. Later that day, each company issued a press release announcing that it had reached an agreement with the other. CA's press release stated in relevant part that CA

> has reached an agreement in principle with the management of [On–Line] whereby CA will acquire all of the outstanding common stock of On–Line for $15-3/4 per share in cash. The transaction is subject to the approval of the Boards of Directors of On–Line and CA,

the execution of definitive agreements and regulatory approval.

On–Line's press release was very similar to CA's, except it also noted that "no assurance can be given that a transaction between On–Line and Computer Associates of any sort will occur."

After issuing their August 16 press releases, CA and On–Line continued to negotiate the terms and conditions of their agreement. They agreed that the transaction would take the form of a tender offer and a follow-up merger. On August 20, CA's Board of Directors approved a Merger Agreement, a Stock Purchase and Non Competition Agreement (the "Berdy Agreement"), and several related agreements. The CA Board also authorized the requisite Securities and Exchange Commission ("SEC") filings and the dissemination to On–Line shareholders of an Offer to Purchase. On August 21, On–Line's Board unanimously approved the Merger Agreement, recommended the transaction to On–Line shareholders, and authorized the necessary filings with the SEC.

Pursuant to the Berdy Agreement, which was executed by CA, LWB, and Berdy, LWB purchased Berdy's On–Line stock for $15.75 per share, the same price that CA offered to all other On–Line shareholders. The Berdy Agreement also provided that he could not tender his shares in the tender offer, and that, if another bidder made a better offer, LWB retained an option to purchase Berdy's shares for $15.75 per share. The Berdy Agreement contained a provision prohibiting him from "engag[ing] in any business activities which are competitive with the computer software business activities of CA, [LWB, or On–Line]" for a period of five years, in consideration for which CA agreed to pay Berdy $5 million. Berdy, who in addition to being On–Line's Chairman had been a medical student since 1989, was not restricted from "engag[ing] in the design, development, marketing, licensing or sale of computer software designed for use in the medical industry, in the biological sciences or as a teaching aid for educational purposes." Gerber argues that, because Berdy was disengaging from the business to pursue his medical studies, CA was not genuinely concerned about the possibility of his competing and that the $5 million payment to him—or part of it—was actually additional compensation to ensure that CA acquired Berdy's large block of On–Line shares. CA, on the other hand, insists that it genuinely feared potential competition from Berdy and that the entire $5 million was consideration for Berdy's agreement not to compete.

On August 21, 1991, CA and On–Line executed the Merger Agreement, obligating CA to commence the tender offer "as promptly as practicable," and CA, LWB, and Berdy executed the Berdy Agreement. On August 22, CA and On–Line issued a joint press release announcing that the two companies had entered into an agreement and that CA "will make a tender offer today" and conduct a follow-up merger. The same day, August 22, CA filed with the SEC and disseminated to On–Line shareholders the Offer to Purchase, offering to purchase all shares of On–Line stock not owned by Berdy for $15.75 per share. The Offer to Purchase stated that it would remain open until September 20, 1991. A majority of On–Line shareholders tendered their shares to CA, and CA and LWB completed the acquisition of On–Line with the follow-up merger.

Gerber is an On–Line shareholder who tendered his stock in response to CA's tender offer. He brought this action individually and on behalf of a class of On–Line shareholders (excluding the defendants, their directors, certain On–Line employees, and their immediate families) who

tendered On–Line stock to CA in the tender offer. The complaint alleged that several defendants (including CA, Wang, Kumar, and Berdy) had violated Section 14(d)(7) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(d)(7), and SEC Rule 14d–10, 17 C.F.R. § 240.14d–10 (collectively, the "Williams Act claims"), as well as various other provisions of the federal securities laws, by offering and paying more consideration to Berdy for his On–Line shares than it offered or paid to other On–Line shareholders.[1]

The gravamen of Gerber's Williams Act claims is that the $5 million that CA paid to Berdy, while nominally consideration for Berdy's five-year non-compete agreement, was actually additional consideration for Berdy's On–Line stock. The defendants moved to dismiss the Williams Act claims, arguing that the tender offer did not begin until August 22, 1991 and that the Berdy Agreement, which was executed on August 21, preceded the tender offer. The District Court denied the motion, concluding as a matter of law that the tender offer commenced on August 16, 1991, when CA issued its first press release. *Gerber v. Computer Assocs. Int'l, Inc.*, 812 F.Supp. 361, 366 (E.D.N.Y.1993). The court subsequently certified a class under Fed. R.Civ.P. 23(b)(3) consisting of "all persons who tendered stock of On–Line pursuant to the tender offer announced by Computer Associates on August 16, 1991." *Gerber v. Computer Assocs. Int'l, Inc.*, No. 91 CV 3610(SJ), 1995 WL 228388, at *5 (E.D.N.Y. Apr.7, 1995). Following discovery, the defendants moved for summary judgment. The District Court granted summary judgment in part but, finding genuine issues of material fact, the court denied the motion with respect to the Williams Act claims.

The case went to trial before Judge Wolle. In order to demonstrate the legitimacy of Berdy's non-compete agreement, CA sought to introduce evidence of other transactions in which it had entered into non-compete agreements. Finding that this evidence would waste time and confuse the jury, the District Court excluded it. At the close of trial, the District Court instructed the jury, without objection, to "consider whether the payment of 5 million dollars under the so-called Berdy agreement was paid to Dr. Berdy for his On–Line shares, or his agreement not to compete, or partly for the shares and partly for the agreement not to compete." (Trial Transcript ("Tr.") at 825.) The jury returned a special verdict in favor of the plaintiff class, finding that $2.34 million of the $5 million that CA had paid to Berdy was compensation for Berdy's On–Line shares, while the remainder was legitimate consideration for the non-compete agreement. Judgment was entered in favor of the plaintiff class in the amount of $5,670,507. The District Court awarded the plaintiff class prejudgment interest of $4,646,242.54. CA moved for judgment as a matter of law or, in the alternative, for a new trial, and the District Court denied the motion. CA and LWB appealed.

## DISCUSSION

CA and LWB make three arguments on appeal. First, they argue that Gerber's Williams Act claims are insufficient as a matter of law because the Berdy Agreement was not executed during the tender offer and because the $5 million was not paid to Berdy during the tender offer. Second, they argue that the District Court erred in excluding the evidence of other CA transactions involving non-competition payments. Third, they argue that the Dis-

1. All claims other than the Williams Act claims against CA and LWB were either dismissed or withdrawn before trial and are not at issue in this appeal.

trict Court erred in permitting the jury to find that part of the $5 million that CA paid to Berdy was compensation for the non-competition agreement and part was additional consideration for Berdy's On–Line shares. We address each of these arguments in turn.

## I. Sufficiency of Williams Act Claims

Defendants challenge the legal sufficiency of Gerber's Williams Act claims. Section 14(d)(7) provides:

> Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

15 U.S.C. § 78n(d)(7) (2000). Rule 14d–10 provides in relevant part:

> (a) No bidder shall make a tender offer unless:
>
> (1) The tender offer is open to all security holders of the class of securities subject to the tender offer; and
>
> (2) The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.

17 C.F.R. § 240.14d–10 (2001). Section 14(d)(7) and Rule 14d–10 collectively are commonly referred to as the All Holders/Best Price Rule. *See Field v. Trump,* 850 F.2d 938, 942–43 (2d Cir.1988); Michael D. Ebert, *"During the Tender Offer"*

*(Or Some Other Time Near It): Insider Transactions Under the All Holders/Best Price Rule,* 47 Vill. L.Rev. 677, 677 (2002). Rule 14d–10(a)(1) codifies the All Holders Requirement, and Rule 14d 10(a)(2) codifies the Best Price Rule. *Field,* 850 F.2d at 942–43.

### A. Whether the Berdy Agreement Was Executed During the Tender Offer

■ Defendants' arguments regarding the legal sufficiency of the Williams Act claims focus primarily on timing. First, defendants argue that CA's $5 million payment to Berdy could not have violated the Best Price Rule because the Berdy Agreement was executed prior to the commencement of CA's tender offer, and the Best Price Rule is not triggered until a tender offer has begun. According to defendants, the tender offer did not begin until August 22, 1991, when CA disseminated the Offer to Purchase and issued a joint press release with On–Line explicitly announcing a tender offer. Gerber argues that the Best Price Rule was triggered on August 16, 1991, when CA and On Line issued press releases announcing that they had reached an agreement in principle. If defendants are correct, and the tender offer did not commence until August 22, then the Berdy Agreement preceded the tender offer and is not subject to the Best Price Rule. If Gerber is correct, and the tender offer commenced on August 16, then the Berdy Agreement was executed during the tender offer and must satisfy the Best Price Rule.

In order to determine when the tender offer commenced, we turn to SEC Rule 14d–2. 17 C.F.R. § 240.14d–2 (1991). In 1991, Rule 14d–2(b) provided [2]:

---

**2.** Rule 14d–2 was amended subsequent to the events giving rise to this litigation, but the parties do not urge us to apply the amendment retroactively.

A public announcement by a bidder through a press release, newspaper advertisement or public statement which includes the information in paragraph (c) of this section with respect to a tender offer in which the consideration consists solely of cash and/or securities exempt from registration under section 3 of the Securities Act of 1933 shall be deemed to constitute the commencement of a tender offer. . . .

17 C.F.R. § 240.14d–2(b). Rule 14d–2(c) provided:

The information referred to in paragraph (b) of this section is as follows:

(1) The identity of the bidder;

(2) The identity of the subject company; and

(3) The amount and class of securities being sought and the price or range of prices being offered therefor.

17 C.F.R. § 240.14d–2(c). Under Rule 14d–2(b), if CA's August 16 press release "include[d] the information in [Rule 14d–2(c) ]," then the August 16 press release "shall be deemed to constitute the commencement of [the] tender offer." CA's August 16 press release states:

Computer Associates International, Inc. ("CA") announced today that it has reached an agreement in principle with the management of On–Line Software International, Inc. whereby CA will acquire all of the outstanding common stock of On–Line for $15–3/4 per share in cash. The transaction is subject to the approval of the Boards of Directors of On–Line and CA, the execution of definitive agreements and regulatory approval.

This press release includes all the information listed in Rule 14d–2(c): (1) it identifies CA as the bidder; (2) it identifies On–Line as the subject company; and (3) it identifies "all ... outstanding common stock" as the amount and class of securities being sought, and "$15–3/4 per share in cash" as the offer price. CA nonetheless contends that its August 16 press release should not be deemed to have commenced a tender offer because the press release was not made "with respect to a tender offer," because the press release states that the transaction is subject to future conditions, and because CA issued the press release to fulfill certain disclosure obligations. *For the reasons discussed below, we reject each of these contentions.*

In arguing that its August 16 press release was not made "with respect to a tender offer," CA confuses the test for *whether* a tender offer has occurred with the test for *when* a tender offer commences. CA argues that, under the "totality of the circumstances" test of *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir.1985), and the eight-factor test of *Wellman v. Dickinson*, 475 F.Supp. 783 (S.D.N.Y.1979), the tender offer began on August 22, not August 16, because those tests were not satisfied until August 22. As the District Court correctly found, however, *Hanson* and *Wellman* both involve the issue of *whether* a tender offer has occurred, not *when* a tender offer starts, and the parties here do not dispute that a tender offer occurred. *Gerber*, 812 F.Supp. at 366. Rather, the only question is when the tender offer commenced, a question which is answered by Rule 14d–2(c), not by *Hanson* or *Wellman*. *See Lerro v. Quaker Oats Co.*, 84 F.3d 239, 246 (7th Cir.1996) (noting that "our case is about 'when' rather than 'what' "). For the same reason, CA's reliance on *Weeden v. Continental Health Affiliates, Inc.*, 713 F.Supp. 396 (N.D.Ga.1989), is misplaced. The court in *Weeden* concluded that, although the defendant's press release included all the information listed in Rule 14d 2(c), the press release had not been

made "with respect to a tender offer," and therefore did not commence a tender offer, because no tender offer ever occurred. *Weeden,* 713 F.Supp. at 402–03. Here, however, it is undisputed that a tender offer occurred, and CA's August 16 press release announced a transaction that undisputedly was a tender offer. Thus, we have no trouble concluding that CA's August 16, 1991 press release was made "with respect to a tender offer."

■ CA also argues that its August 16 press release was not made "with respect to a tender offer" because the press release does not contain the words "tender offer." While the August 16 press release does not contain the words "tender offer," Rule 14d–2(c) imposes no such requirement. Because the entire purpose of that rule is to prescribe the information that a public announcement must contain in order to commence a tender offer, we deem it dispositive that the words "tender offer" are not among the Rule's prescriptions. To the extent CA asks us to graft an additional requirement onto Rule 14d–2(c), we decline to do so. "Were the label used by the acquiror determinative, virtually all of the provisions of the Williams Act, including the filing and disclosure requirements[,] could be evaded simply by an offeror's announcement that offers to purchase [ ] stock were private purchases." *Field,* 850 F.2d at 944 (citation omitted).

We also reject CA's argument that the press release did not commence a tender offer because it stated that the transaction was subject to future conditions—i.e., the approval of On–Line's and CA's Boards of Directors, the execution of definitive agreements, and regulatory approval. Nothing in Rule 14d–2 or Rule 14d–10 renders them inapplicable to tender offers that are subject to conditions. Indeed, CA's ultimate Offer to Purchase, which CA contends commenced the tender offer, also states that the transaction is subject to certain conditions. Our conclusion that CA's August 16 press release commenced a tender offer, despite the presence of future conditions, is consistent with the Seventh Circuit's decision in *Lerro,* upon which defendants place considerable reliance. The plaintiffs in *Lerro* contended that a tender offer begins "as soon as a potential bidder opens negotiation with a potential target's management," even if no public announcement has been made. *Lerro,* 84 F.3d at 245. The court rejected this contention, holding that, under Rule 14d–2, " 'the tender offer' means the definitive announcement, not negotiations looking toward an offer." *Id.* Unlike the situation in *Lerro,* CA's August 16 press release did not announce mere "negotiations looking toward an offer"; rather, the release stated that CA and On Line had "reached an agreement in principle." Accordingly, whatever conditions remained after CA's August 16 press release do not prevent that release from marking the commencement of the tender offer.

CA also contends that its August 16 press release did not commence the tender offer because CA issued that release in response to NYSE inquiries and in order to fulfill disclosure obligations. CA argues that it cannot be penalized under one provision of the Exchange Act as a result of its compliance with a disclosure obligation under another provision. We need not reach the merits of this argument for the simple reasons that the NYSE did not make any inquiries of CA on August 16 and CA has not pointed to any particular disclosure obligation that it faced on that date. As CA acknowledges, the NYSE made inquiries of On–Line, not of CA, and did so after "unusual market activity in On–Line stock." On–Line responded to these inquiries by issuing its own press release on August 16, stating that the

management of CA and On–Line had "reached agreement at $15.75 per share." Thus, CA's independent press release was not necessary to respond to the NYSE's inquiries. Because there is no evidence that CA issued its August 16 press release in response to any NYSE inquiry or to fulfill any actual disclosure obligation, and for all the reasons discussed above, we conclude that the tender offer commenced on August 16, 1991.

### B. Whether Berdy Was Paid During the Tender Offer

■ Next, CA argues that, regardless of when the tender offer commenced, the $5 million payment to Berdy cannot violate the Best Price Rule because Berdy was paid after, and not during, the tender offer. CA relies on Rule 14d–10(a)(2), which requires a bidder to pay to any security holder pursuant to a tender offer "the highest consideration paid to any other security holder *during such tender offer.*" 17 C.F.R. § 240.14d–10(a)(2) (emphasis added). While Rule 14d–2 governs the determination of when a tender offer commences, no pertinent rule or statute addresses when a tender offer concludes. CA would have us create a rigid rule equating the duration of a tender offer, for purposes of Rule 14d–10(a)(2), with the offer's self-prescribed expiration date. Such a rule would benefit CA, as its tender offer "closed" on September 20, 1991, and Berdy was not paid until September 25, 1991. We believe that the phrase "during the tender offer," however, is flexible enough to include CA's payment to Berdy, which occurred after the shares had been tendered but before any other On–Line shareholder was paid. *See Epstein v. MCA, Inc.,* 50 F.3d 644, 654 (9th Cir.1995) ("[T]he term 'tender offer,' as used in the federal securities laws, has never been interpreted to denote a rigid period of time."), *rev'd on other grounds sub nom.*

*Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). We deem it significant that Berdy was paid before all other On–Line shareholders, so that, if Berdy was not paid "during the tender offer," then neither was any other On–Line shareholder.

More fundamentally, equating the termination of a tender offer with the offer's self-imposed expiration date, as CA would have us do, would make it all too easy to contract around the Best Price Rule. For example, the Berdy Agreement required CA to pay Berdy for his On–Line stock at a closing which was to occur "as soon as practicable after the expiration of the [tender offer]...." If this agreement removed Berdy's $5 million payment from the ambit of the Best Price Rule, then the Best Price Rule would be rendered toothless. Rule 14d–10 "cannot be so easily circumvented." *Epstein,* 50 F.3d at 655 (noting that the imposition of a rigid timing requirement on the duration of tender offers "would drain Rule 14d–10 of all its force").

In concluding that Berdy was paid during the tender offer, we draw upon our decision in *Field,* 850 F.2d 938, where we looked past the labels that the parties had attached to their transactions. In *Field,* defendants Julius and Eddie Trump commenced a tender offer at a price of $22.50 per share for the stock of Pay'n Save Corporation, withdrew the tender offer four days later, acquired an option to purchase the shares of certain Pay'n Save directors for $25.00 per share ($23.50 per share plus a $900,000 premium for so-called "fees and expenses"), then announced a new tender offer at $23.50 per share. *Field,* 850 F.2d at 940, 942. The plaintiffs argued that the arrangement violated the Best Price Rule, as the Pay'n Save directors received $1.50 more per share than other Pay'n Save shareholders. *Id.* at 942. The defendants argued that

their agreement with the directors was not executed during a tender offer, as the agreement was executed after the original tender offer was withdrawn and before the second tender offer commenced. *Id.* at 943. We refused to give effect to the defendants' use of the labels "withdrawal" and "new" tender offer. *Id.* at 944. Instead, we focused on the Trumps' intent. *Id.* at 945. Because the Trumps never abandoned the goal of their original tender offer, we concluded that the second tender offer was a continuation of the first, and that the Trumps had entered into the agreement to purchase the Pay'n Save directors' stock during the tender offer. *Id.*

Like the defendants in *Field,* CA continuously pursued the goal of its tender offer, the acquisition of On–Line. We have already determined that the Berdy Agreement was executed during the tender offer, and a properly instructed jury determined that CA paid part of the $5 million to Berdy as compensation for his On–Line shares. Far from having abandoned its intent to acquire On–Line, CA paid Berdy in support of its tender offer. In assessing CA's intent, it is significant that Berdy was paid before all other On–Line shareholders. In purchasing a majority of the outstanding common stock of On Line, and in paying the On–Line shareholders for that stock, CA clearly intended to acquire On–Line. Thus, when CA paid Berdy in support of its continuous goal of acquiring On–Line, it did so during the tender offer. We noted in *Field* that "giving effect to every purported withdrawal that allows a discriminatory premium to be paid to large shareholders would completely undermine the 'best-price rule.'" 850 F.2d at 944. Finding that Berdy was paid after, and not during,

the tender offer would have the same effect.

In summary, the tender offer commenced on August 16, 1991, the date that CA issued its press release announcing its agreement in principle with On–Line, *see* 17 C.F.R. § 240.14d–2(a), and Berdy was paid "during such tender offer," 17 C.F.R. § 240.14d–10(a)(2). Accordingly, we conclude that Gerber's Williams Act claims are sufficient as a matter of law.

## II. Other CA Transactions Involving Non Competition Payments

At trial CA sought to introduce evidence of a number of other transactions in which it made substantial payments to individuals in exchange for non-competition agreements. The District Court admitted some of this evidence[3] but excluded most of it because:

> None [of the other transactions] were sufficiently similar to the circumstances of this transaction to warrant their receipt in evidence. Defendants did not demonstrate that any probative value of their proffer of other transactions would or could outweigh the waste of time and potential confusion of the jury that their receipt in evidence would have caused. The so-called Berdy Agreement constituted a transaction that was quite different from and could not fairly be compared with the dissimilar merger and buyout transactions proffered by defendants.

Under Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

---

3. The court permitted Kumar to testify that CA had made payments in exchange for noncompete agreements in many other transactions and that many of those payments exceeded $5 million.

presentation of cumulative evidence." In applying Rule 403, "the trial judge has broad discretion to weigh the probative value of the evidence against the negative factors." *Li v. Canarozzi,* 142 F.3d 83, 88 (2d Cir.1998). "Because the trial judge sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence, we will not overturn his ruling unless he has acted arbitrarily or irrationally or has otherwise abused his discretion." *Id.; see also Costantino v. Herzog,* 203 F.3d 164, 173 (2d Cir.2000) (noting that trial judge's "Rule 403 rulings are entitled to considerable deference and will not be overturned absent a clear abuse of discretion").

■ We find no error, and certainly no abuse of discretion, in the District Court's evidentiary rulings. The court permitted CA to adduce general evidence of other non-compete agreements, but it correctly excluded the details of these other transactions. Details of the other CA transactions would have had minimal probative value because, as CA's Kumar testified, "every deal is a different deal" and determining the amount of a non-compete payment "is an individual evaluation." (Tr. at 481, 479.) Once the jury learned of the existence of non-compete payments in other CA transactions, the details of those transactions possessed little probative value. Accordingly, the District Court acted well within its discretion in concluding that "no details of other transactions may be gone into because it would lead to a waste of time, to essentially assess each other transaction by the same measure that the jury will have to assess this transaction." (*Id.* at 561.)

### III.  Jury's Apportionment of $5 Million Payment

■■ Lastly, CA argues that the District Court erred in instructing the jury that it could find that CA paid $5 million to Berdy "partly for the shares and partly for the agreement not to compete" (Tr. at 825) and that the jury's finding that $2.34 million of the $5 million was compensation for Berdy's shares represents an impermissible compromise verdict. We review the District Court's jury instructions *de novo. Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 153 (2d Cir.1997).

CA contends that there was no evidentiary predicate for the District Court's apportionment instruction, which permitted the jury to apportion the $5 million between compensation for Berdy's On–Line stock and compensation for Berdy's agreement not to compete. *See Perry,* 115 F.3d at 153 ("A party is not entitled to have the court give the jury an instruction for which there is no evidentiary predicate at trial."). We disagree.

■ Sufficient evidence was adduced at trial to support the conclusion that some, but not all, of the $5 million was consideration for Berdy's On–Line shares. For example, CA's expert, Ronald Gilson, testified that, as of 1991, the expected loss to CA as a result of Berdy's competing depended on four variables:

a. the percentage decrease in [CA's] sales resulting from Mr. Berdy's competition;

b. [CA's] resulting after-tax cash flow loss;

c. the likelihood of Mr. Berdy competing; and

d. when Mr. Berdy begins to compete.

(Expert Report of Ronald J. Gilson at 8; Tr. at 611–12.) Gilson's report was admitted into evidence, and he testified extensively about its contents. (Tr. at 713.) According to Gilson's testimony and report, there were many scenarios in which the expected loss to CA as a result of the

risk of Berdy's competing would have been between $0 and $5 million. (Tr. at 616–18, 649–50; Expert Report of Ronald J. Gilson, Exs. C, D, E, F, and G.) Thus, CA's own expert provided a sufficient predicate for the District Court's apportionment instruction. In addition, Kumar, who was CA's primary negotiator with On–Line and Berdy, testified that he performed no mathematical analysis in arriving at the $5 million figure, and that he reached that amount by "intuition." (Tr. at 480–81.) Finally, because the jury's verdict draws support from the evidence introduced at trial, it was not an impermissible compromise. *Vichare v. AMBAC Inc.,* 106 F.3d 457, 463 (2d Cir.1996) ("Traditionally, in order to constitute an impermissible compromise the verdict must, at least, be inconsistent with the facts adduced at trial.").

## CONCLUSION

For these reasons, we affirm the judgment of the District Court. We have considered all of appellants' other contentions on appeal and have found them to be without merit.