In re: **LUXOTTICA GROUP S.p.A., SECURITIES LITIGATION**

No. 01 CV 3285 NG MDG.

United States District Court, E.D. New York.

Nov. 26, 2003.

James W. Johnson, Goodkind, Labaton, Rudoff & Sucharow, L.L.P., New York, NY, for Plaintiffs.

Michael D. Torpey, Clifford Chance US LLP, San Francisco, CA, for Defendants.

### OPINION AND ORDER

GERSHON, District Judge.

This securities class action was brought by individuals who sold their shares of Sunglass Hut, Inc. ("Sunglass Hut") to Shade Acquisition Group ("Shade Acquisi-

tion"), pursuant to a tender offer made in March of 2001 as part of a two-step merger between Sunglass Hut and Luxottica Group S.p.A. ("Luxottica"). Plaintiffs bring claims against Luxottica; Luxottica's controlling shareholder, Leonardo Del Vecchio ("Del Vecchio"); Shade Acquisition, a wholly owned subsidiary of Luxottica; James N. Hauslein, Sunglass Hut's Chairman of the Board; and Rohit Desai, John Duerdan, Robert Grayson, Michael McCadden and William W. Philips, the directors of Sunglass Hut (the "Directors") at the time of the tender offer and merger. Plaintiffs allege violations of: (1) the "Best–Price" provision of the Williams Act, Section 14(d) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78n(d); (2) Section 10(b) of the Act's prohibition against "false or misleading statements," 15 U.S.C. § 78j(b); and (3) state law breach of fiduciary duty obligations. All defendants move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants are split into the following three groups, each filing a separate motion: Luxottica, Del Vecchio and Shade Acquisition Group; Hauslein; and the Sunglass Hut Directors.

### Background

The following facts are alleged in the Amended Complaint:

Luxottica, an Italian corporation, is a manufacturer and distributor of prescription eyeglass frames and sunglasses. Del Vecchio, a citizen and resident of Italy, is the founder and Chairman of the Board of Directors of Luxottica and is the beneficial owner of approximately 69% of Luxottica's ordinary shares. Shade Acquisition, a Florida corporation, was an indirect, wholly-owned subsidiary of Luxottica that was formed for the purpose of making a tender offer for the shares of Sunglass Hut.

Sunglass Hut, a Florida corporation, is a specialty retailer of sunglasses and watches. James Hauslein was the Chairman of Sunglass Hut's Board of Directors (the "Board") from 1991 until the merger and holder of approximately 4% of the total outstanding shares of Sunglass Hut. In January of 2001 he became the company's Chief Executive Officer.

During the first fiscal quarter of 2000, Luxottica developed an interest in acquiring Sunglass Hut. To that end, Le Leonardo Finanziaria S.r.l., a company established and controlled by Del Vecchio, purchased 2,259,600 shares of Sunglass Hut's stock between March 17 and April 19, 2000, at the average purchase price of $7.78. These purchases brought Del Vecchio's holdings of Sunglass Hut stock to in excess of 5% of the outstanding shares of Sunglass Hut, triggering the filing requirements of Section 13(d) of the Act. Del Vecchio did not file a Schedule 13D regarding these purchases until March 5, 2001; the Schedule 13D filed on that date states that Luxottica viewed Sunglass Hut as a "possible combination candidate" at the time of the purchases.

On April 27, 2000, Luxottica, through its investment banker, Rothschild, Inc., approached Sunglass Hut regarding the possibility of a business combination. Hauslein, who at this time was serving as the Chairman of Sunglass Hut's Board and was the direct, beneficial owner of 1,768,-311 shares of Sunglass Hut stock (approximately 4% of the total outstanding shares of Sunglass Hut and an amount significantly larger than any other director or officer), indicated that he and the Directors were amenable to discussing a potential transaction. The initial proposals, which commenced with a proposed stock for stock merger, and culminated in June of 2000 with an offer to acquire Sunglass Hut's stock for $8.50 plus a warrant to purchase 1/10 of a share of Luxottica's ordinary stock, were rejected, and discussions of a merger ceased.

In January of 2001, Hauslein became CEO of Sunglass Hut, and merger discussions were resumed, with Hauslein playing the primary role in the negotiations on behalf of Sunglass Hut. At Hauslein's direction, and in furtherance of the proposed merger, Sunglass Hut allowed Luxottica to conduct limited financial due diligence of Sunglass Hut. In mid-January, Luxottica made a tender offer of $9.10 per share, which, upon the advice of Sunglass Hut's financial advisor Morgan Stanley & Co., was rejected by the Board; discussion continued. In February of 2001, the parties entered into a confidentiality, standstill and exclusivity agreement, after which Morgan Stanley delivered certain financial information to Luxottica. After the information exchange, Luxottica increased its offer to $10.50 per share in cash, and the parties continued their discussions. On February 19, 2001, Luxottica offered $11.25 per share. That same day, recognizing that Hauslein's position as Board Chairman and CEO of Sunglass Hut made his willing participation in, and endorsement of, the tender offer essential to its success, Luxottica indicated that it would increase the tender offer if he entered into a non-competition and consulting agreement (the "Consulting Agreement") to be effective upon the consummation of the merger.

The Consulting Agreement (which was not executed until February 22, 2002) was conditioned upon the successful completion of the merger agreement and specifically provides that, if the merger were terminated, "none of [Luxottica], [Sunglass Hut] and [Hauslein] shall have any rights duties or obligations from and after any such termination." The Consulting Agreement also provides that, in exchange for certain

services, Luxottica is obligated to pay Hauslein $15,000,000 in monthly installments of $250,000 and specifically states that Hauslein has to make himself reasonably available to Luxottica but is "not required to devote all his business time to services hereunder." Hauslein's prior employment agreement with Sunglass Hut, provided $375,000 in annual salary, and required him to "devote substantially all his working time and attention to the business and affairs of [Sunglass Hut]."

On February 20, 2001, Luxottica provided a draft acquisition agreement to Sunglass Hut. On February 21, 2001, Luxottica, confident that Hauslein would support the tender offer, indicated that it would increase its offer to $11.50 per share if Sunglass Hut would approve the transaction promptly. That evening, Hauslein informed the Board of the increased tender offer and the Consulting Agreement, and he told the Board that he supported the offer of $11.50 per share. By unanimous vote the Board approved the tender offer and the merger and recommended that the shareholders accept the offer and tender their shares. That same day, Luxottica's Board of Directors approved the tender offer and the merger. The Consulting Agreement was executed by Hauslein and Del Vecchio on behalf of Luxottica on February 22, 2001, and that day Luxottica, Sunglass Hut and Shade executed the Tender Offer and Merger Agreement and the Consulting Agreement, and the parties issued a joint press release announcing the transaction.

In accordance with the Tender Offer and Merger Agreement, on March 5, 2001, Shade Acquisition made a tender offer to purchase all shares of Sunglass Hut's common stock for $11.50 (the "Tender Offer"). On that same day Del Vecchio filed a Schedule 13D, which revealed both Luxottica's purchases of Sunglass Hut shares in March and April of 2000, and that Luxottica considered Sunglass Hut as a "possible combination candidate."

Contemporaneously with the Tender Offer, Sunglass Hut made its Schedule 14D-9 filing. As indicated in the Schedule 14D-9, Hauslein's support for the Tender Offer was relied upon by the Directors. The filing states that "[i]n making the determination and recommendations" for tender, the Board considered:

> the fact that James N. Hauslein, one of the Company's principal shareholders, indicated that he was prepared to endorse the [Tender Offer and] Merger Agreement and to tender all of his shares in response to the [Tender Offer].

Hauslein's support was also prominently featured in Hauslein's letter to shareholders that accompanied the filing, which stated that he and the other directors "unanimously approved the [Tender] Offer and the Merger ... and determined that the [Tender] Offer and Merger are advisable, fair to, and in the best interests of the holders of shares of common stock."

On March 30, 2001, pursuant to the Tender Offer, Luxottica accepted 39,041,093 shares of Sunglass Hut's stock (comprising 97.1% of the outstanding shares). Hauslein tendered his 1.7 million shares under the Tender Offer.

*Procedural History*

Various parties filed actions in this court complaining of these events. On August 8, 2001 Greenway Partners moved, unopposed, for consolidation of the related actions, appointment as lead plaintiff and approval of its selection of lead counsel. The motion was referred to Magistrate Judge Marilyn Dolan Go, by then District, now Circuit, Judge Reena Raggi who was originally assigned to this case. Judge Go granted all of the requests of Greenway Partners on September 17, 2001. On No-

vember 1, 2001, plaintiffs filed an amended consolidated class action complaint.

That pleading presents four claims: 1) violation of Section 14(d) of the Act and Securities Exchange Commission ("SEC") Rule 14d–10 by Luxottica and Shade Acquisition; 2) violation of Section 10(b) of the Act and Rule 10b–5 by Luxottica and Del Vecchio; 3) breach of fiduciary duty by Hauslein, and aiding and abetting the breach by Luxottica and Shade Acquisition; and 4) breach of fiduciary duty by the Directors. Luxottica, Del Vecchio and Shade Acquisition move to dismiss the claims under Section 14(d) and Section 10(b); Hauslein, Luxottica and Shade Acquisition move to dismiss the claim of breach of fiduciary duty against them; and the Directors move to dismiss the breach of fiduciary duty claims against them.

### Standard

In considering a motion to dismiss, a court is required to read the complaint with "great generosity," *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 558 (2d Cir.1985), and the court must assume that all the facts alleged in the complaint are true. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). All reasonable inferences are drawn in the plaintiff's favor, *Brooklyn Bridge Park Coalition v. Port Authority,* 951 F.Supp. 383, 387 (E.D.N.Y.1997), and only where a plaintiff can prove no set of facts in support of the claim is dismissal warranted. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In deciding a motion to dismiss, a court may take judicial notice of the contents of relevant SEC filings, "not to prove the truth of their contents, but only to determine what the documents stated." *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991).

### Discussion

### Section 14(d)(7)

Plaintiffs allege a violation of the "Best Price" provision of Section 14(d)(7) of the Williams Act, codified at 15 U.S.C. § 78n(d)(7), which regulates tender offers. Specifically, plaintiffs claim that the Consulting Agreement violates Section 14(d)(7) because it provided Hauslein with a better price for his shares than was given to other shareholders for theirs. Defendants (Luxottica, Del Vecchio and Shade Acquisition) contend that plaintiffs' Best–Price Claim must be dismissed because: (1) there is no private right of action under Section 14d–10; (2) plaintiffs have not complied with the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b)(1)(A); (3) the Consulting Agreement was not entered into during the Tender Offer so it does not qualify as having increased the consideration paid to Hauslein "during the tender offer" as required by 15 U.S.C. § 78n(d)(7); and (4) the Consulting Agreement does not qualify as increased consideration paid to a holder of securities under a tender offer because it does not involve a purchase of securities.

As to defendants' first argument, that there is no private right of action under Rule 14d–10, the complaint explicitly references Section 14(d)(7), 15 U.S.C. § 78u–4(b)(1)(A), and it is clear that plaintiffs are bringing a claim pursuant to Section 14(d)(7), which affords private plaintiffs an implied right of action. *Field v. Trump,* 850 F.2d 938, 945–46 (2d Cir.1988); *Epstein v. MCA, Inc.,* 50 F.3d 644, 649–50 (9th Cir.1995), *rev'd on other grounds,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *Polaroid Corp. v. Disney,* 862 F.2d 987, 996 (3d Cir.1988).

Defendants' second argument, that plaintiffs have not satisfied the PSLRA's pleading requirements, is also meritless. The PSLRA requires that, when bringing a claim that a defendant "made an untrue statement of a material fact," 15 U.S.C. § 78u–4(b)(1)(A), a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). However, plaintiffs are not making a fraud claim nor does the "Best Price" provision of the Williams Act require a showing of fraud. That a plaintiff could potentially make a fraud claim does not require it to do so where it can validly state a violation of some other law. Accordingly, the PSLRA is not implicated by plaintiffs' claims, and they are under no obligation to comply with its requirements.

I turn now to defendants' third and fourth arguments. Section 14(d)(7) and Rule 14d–10 collectively are commonly referred to as the "Best Price Rule." *Field v. Trump*, 850 F.2d at 942–43 (2d Cir.1988). They exist "to prevent a tender offeror from discriminating in price among tendering shareholders." *Id.* Section 14(d)(7), 15 U.S.C. § 78n(d)(7), provides that:

> Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or invitation.

In 1999, the SEC amended the regulations governing the commencement of a tender offer so that commencement is the point at which a bidder first publishes, sends or gives security or gives security holders the means to tender securities in the offer. *See Regulation of Takeovers and Security Holder Communications,* Exchange Act Release No. 33–7760, 1999 WL 969596 (October 22, 1999). However, the SEC specified that:

> Although we are changing the rules of how a tender offer is commenced . . . we are not defining the term "tender offer" or changing our position on what activities may be deemed to constitute tender offers. The tender offer rules still may apply to activities that function as unconventional tender offers. We maintain our position that the term tender offer should be interpreted flexibly . . . A determination of whether a particular transaction . . . constitutes a tender offer will, of course, depend on the particular facts and circumstances and is not limited to 'conventional' tender offers. *Id.* at 119 n. 92.

The Second Circuit has adopted the position that, as neither the Williams Act nor the SEC provides a rule as to what constitutes a tender offer, "courts faced with the question of whether purchases of a corporation's shares are privately negotiated or are part of a tender offer have applied a functional test that scrutinizes such purchases in the context of various salient characteristics of tender offers and the purposes of the Williams Act." *Field v. Trump*, 850 F.2d at 943–44. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 778–79 (2d Cir.1991). In *Gerber v. Computer Associates*, 303 F.3d 126, 135 (2d Cir.2002), the Second Circuit noted that *Field* requires the court to "look past the labels parties place on their transactions," and cited *Epstein v. MCA, Inc.*, 50 F.3d at 655, for the proposition that a rigid timing requirement on the duration of tender offers "would drain Rule 14(d)–10 of all its force."

■ Defendants contend that the Consulting Agreement does not come within the temporal limitations of the Best Price Rule because it was entered into prior to the commencement of the Tender Offer. In support of this contention, defendants argue that, although the Second Circuit has adopted a flexible pleading standard, every Best Price Rule case decided by the Second Circuit has involved either the imposition of liability where the alleged offending transaction occurred during the tender offer, or a denial of liability where it did not. Defendants then argue that no agreement, regardless of its intent, entered into outside of the official commencement of a tender offer could implicate the Best Price Rule. This position is not supported by the Second Circuit's cases, discussed below, nor would it serve the purposes underlying the Williams Act. Rather, the functional test adopted by the Second Circuit in *Field* requires that the court consider all of the circumstances attendant to the challenged tender offer, including whether the Consulting Agreement was necessary to its consummation. Therefore, the issue before the court is, whether, under the Second Circuit's flexible standard, plaintiffs have sufficiently alleged that the "salient characteristics," *Field*, 850 F.2d at 943–44, of the Consulting Agreement render it functionally inseparable from the Tender Offer.

In *Field*, the Trumps commenced a tender offer at $22.50 per share and then made a timely withdrawal in order to acquire shares from certain directors, the Strouns, who were opposed to the transaction. The dissident directors and the Trumps then reached a side agreement, under which the Strouns agreed to sell their shares in exchange for a $3,300,000 option payment and a $900,000 payment for fees and expenses. After entering into the side agreement, the Trumps made a second tender offer at $23.50 per share.

The $4,200,000 payment to the directors, together with the $23.50 tender offer, resulted in a $1.50 premium per share to the directors. The *Field* defendants argued that, because under Rule 14(d)–2(b) a tender offer withdrawn within five days of commencement is deemed not to have commenced at all, their original tender offer did not exist for the purposes of the Best Price Rule, and therefore the favorable price given to the directors did not occur during a tender offer. The Second Circuit, in reversing the district court's dismissal, rejected this defense as hypertechnical in light of the remedial policies underlying the Best Price Rule. The court stated that the Best Price Rule would be "completely unenforceable if offerors may announce periodic withdrawals during which purchases at a premium are made and thereafter followed by new tender offers." The court went on to state that, "an announcement of withdrawal is effective when the offeror genuinely intends to abandon the goal of the original offer." *Id.* at 945.

Here, as in *Field*, plaintiffs are claiming that defendants attempted to avoid the Williams Act by paying a premium to Hauslein shortly before commencing the Tender Offer. Defendants argue *Field* is not controlling, because here there was no prior commencement and withdrawal of a tender offer and, therefore, the Consulting Agreement, unlike the agreement in *Field*, cannot properly be deemed incorporated into the Tender Offer. Defendants' argument, however, discounts that defendants engaged in protracted unsuccessful negotiations, only then offered the Consulting Agreement to Hauslein and then three days later executed the Tender Offer. A protracted negotiation that is brought to a close only after the target's lead negotiator is offered fifteen million dollars is not functionally different from the scenario pre-

sented in *Field.* In both *Field* and here the acquirer never abandoned its goal of purchasing the target, and that acquisition was not completed until after the offending agreement was executed. *See also Epstein,* 50 F.3d at 652–59.

Defendants rely on *Kramer,* 937 F.2d at 778–79, where the Second Circuit found that the Best Price Rule was not implicated. In *Kramer,* the alleged premium for insider's shares was paid, not by the acquirer, but by the target company. Although, here, as in *Kramer,* the premium was not paid until after the companies were merged, that the premium was offered by Luxottica as the acquirer, not Sunglass Hut, makes the Best Price Rule inapplicable. In *Kramer,* unlike here, there was no allegation that the support of the shareholders who received the premiums was necessary to the success of the tender offer. On the contrary, in *Kramer,* as stated by Judge Sand in the district court decision, the alleged premium "in no way advanced [the acquirer]'s goal of obtaining [the target's] shares." *Kramer v. Time Warner,* 1990 WL 166665, *8 (S.D.N.Y.1990), *aff'd* 937 F.2d 767.

■ Defendants next argue that the Consulting Agreement does not qualify as increased consideration paid to a holder of securities under a tender offer. In *Gerber,* 303 F.3d 126, as here, the challenged premium was labeled a non-competition agreement. Following a jury verdict in favor of plaintiffs, defendants appealed on the ground that plaintiffs had failed to adequately prove a Williams Act claim. The Second Circuit upheld the jury's decision, holding that the district court did not err in instructing the jury that it could find that the acquirer paid a premium "partly for shares and partly for the agreement not to compete," *id.* at 137, and that "[s]ufficient evidence was adduced at trial to support the conclusion that some ... of

the $5 million was consideration for the [insider's] On–Line Shares." *Id.* at 137–138. Implicit in this decision is that payments made to a corporate insider, although ostensibly for his agreement not to compete, may be considered additional compensation for his stock in violation of the Williams Act.

Defendants also claim that, as the Consulting Agreement was contingent upon the success of the Tender Offer and merger, it cannot be read as providing increased consideration. The Consulting Agreement provides that Hauslein is not to compete with, and he is to perform certain functions for, the surviving corporation. For that he is to receive $15,000,000 over five years. This amount is *eight* times the amount Hauslein received under his previous employment agreement with Sunglass Hut and, unlike the prior agreement, does not require that he spend all his time working for Luxottica. Defendants argue that this amount is justified because Hauslein had significant expertise and, without a non-compete agreement, he "would be free to ally himself with [a Luxottica competitor]." While defendants insist that they were genuinely afraid of competing with Hauslein as justification for the generous nature of the Consulting Agreement, the arguments they make as to why the Consulting Agreement was motivated by that purpose and not for the purpose of obtaining Hauslein's shares and support of the Tender Offer, raise factual issues which cannot be resolved on a motion to dismiss. Taking the facts as alleged by plaintiffs and the reasonable inferences to be drawn from those facts, the complaint is sufficient to establish that defendants' true purpose brings them within the Williams Act. Defendants' argument that a jury's determination as to whether the Consulting Agreement provided Hauslein with "too

much" compensation would be "nothing other than pure guesswork" is contradicted by *Gerber.* As just described, the Second Circuit expressly upheld the trial court's decision to allow the jury to apportion a challenged payment to an insider.

■ Finally, defendants argue that, although Hauslein held 4% of Sunglass Hut's stock at the time of the Tender Offer, there were other larger shareholders (including the lead plaintiff) capable of blocking the merger. Even if the court accepts the proposition that plaintiffs could have prevented the merger, they were under no obligation to do so and their failure to do so is no defense to the defendants' breach of their Section 14(d)(7) obligations.

In sum, the court finds that defendants cannot show, as a matter of law, that the Consulting Agreement does not provide increased consideration for a sale of securities in violation of the Williams Act.

### Section 10(b)

Plaintiffs allege that, when Shade Acquisition made its stock purchases on April 19, 2000, those purchases raised Shade Acquisition's ownership interest above 5% and triggered certain reporting requirements under Section 13(d) of the Act. Plaintiffs further allege that defendants' failure to make a timely Section 13(d) filing violates Section 10(b) of the Act. Defendants, (Luxottica, Del Vecchio and Shade Acquisition), argue that there was no violation of Section 13(d) and, even if there were a violation, it was cured when Del Vecchio filed the Schedule 13D at the inception of the Tender Offer.

To state a claim under Section 10(b) and Rule 10b–5, plaintiffs must show that: (1) in connection with the purchase or sale of securities, defendants made false and misleading statements or omissions regarding a material fact concerning the company; (2) the misleading statement or omission

was made with the requisite scienter; and (3) plaintiffs relied on the statement or omission to their detriment. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). An antifraud claim under Section 10(b) may be premised on a false or misleading statement made on a Schedule 13D, *Azurite Corp. Ltd. v. Amster & Co.,* 52 F.3d 15 (2d Cir.1995), or, as it is here, on a failure to timely file a Schedule 13D. *SEC v. Drexel Burnham Lambert,* 837 F.Supp. 587, 608 (S.D.N.Y.1993), *aff'd sub nom. SEC v. Posner,* 16 F.3d 520 (2d Cir.1994).

Section 13(d) states that "any person who, after acquiring ... the beneficial ownership of any equity security ... is directly or indirectly the beneficial owner of more than 5% of such class shall, within 10 days after such acquisition" file with the SEC a statement containing certain information. 15 U.S.C. § 78m(d). The purpose of this section "is to ensure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). For the purpose of determining if the reporting requirements of Section 13(d) have been met, a potential filer may rely upon "information set forth in the issuer's most recent quarterly or annual report... unless he knows or has reason to believe that the information contained therein is inaccurate." 17 C.F.R. § 240.13d–1(j).

When an individual fails to properly file a required Schedule 13D, any effort to change or effect control of the subject company may be enjoined pending the completion of the required filings. *ICN Pharmaceuticals, Inc. v. Khan,* 2 F.3d 484, 489 (2d Cir.1993). An injunction for a Section 13(d) violation will issue only on a showing of irreparable injury to the inter-

ests which the Section seeks to protect, and those interests are fully satisfied when the shareholders receive information required to be filed. *Id.* Thus, if an injunction is entered and a "corrective filing is subsequently made and adequate opportunity is provided for the information that it contains to be digested by the shareholders, the corrective injunction should be terminated." *Id.* Furthermore, if an individual files a Schedule 13D in an untimely manner, but prior to attempting to gain control of a company, an injunction is not appropriate, as the problems addressed by the Williams Act will have been averted. *Id. See also Rondeau,* 422 U.S. at 58, 95 S.Ct. 2069. However, although an untimely filing prior to a tender offer or proxy challenge may eliminate the need for injunctive relief, injured parties still have a remedy because those individuals "who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages." *Rondeau,* 422 U.S. at 60, 95 S.Ct. 2069.

Defendants contest plaintiffs' position that they owned over 5% of the stock of Sunglass Hut as of April 19, 2000. Defendants contend that the percentage they owned surpassed the 5% reporting threshold, not because of their stock acquisitions, but rather because of a repurchase program initiated by Sunglass Hut after April 19, 2000. They argue that, as of the close of business on April 18, 2000, the most recent report filed by Sunglass Hut indicated that the purchases made by defendants did not render them the holders of 5% of Sunglass Hut's shares, and therefore the failure to make a Schedule 13D filing was not in violation of Rule 13d1–(j).

■ First, even assuming that defendants are correct that their own purchases did not exceed the 5% threshold, and that the Rule 13(d)–1(j) rule exception allowing reliance on the "most recently filed quarterly or annual report" excludes those reports made on the day of purchase, defendants knew or should have known of Sunglass Hut's April 19, 2000 filing by the following day. It is not disputed that Sunglass Hut made a Form 10–K filing on April 19, 2000, that contained information regarding the number of Sunglass Hut shares outstanding as of April 14, 2000. Moreover, as plaintiffs correctly point out, defendants' argument ignores the last sentence of Rule 13d–1(j), which provides that a purchaser cannot rely on the most recent quarterly report if he knows, or has reason to know, that the information contained therein is not accurate. 17 C.F.R. § 240.13d–1(j). Sunglass Hut's Form 10–Q for the third quarter of 1999 reveals that Sunglass Hut's Board had authorized a repurchase of 15.5 million shares and that the company had, in fact, started to make those purchases. Therefore, plaintiffs argue, defendants had constructive, if not actual, notice that Sunglass Hut had an ongoing repurchase program that rendered defendants' failure to file misleading. Given the factual issue surrounding the parties' dispute, defendants have not demonstrated that, as a matter of law, the failure to file a Schedule 13D regarding their April 19, 2000 purchases, was not in violation of Section 10(b)'s prohibition on false and misleading statements.

■ Defendants also argue, however, that plaintiffs Section 10(b) claim fails because plaintiffs cannot demonstrate transaction causation, which requires that a plaintiff demonstrate that the alleged misstatement or omission caused plaintiff to buy or sell stock. *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001). Defendants claim that plaintiffs cannot demonstrate transaction causation because de-

fendants cured any earlier omission by including a Schedule 13D as an exhibit to the Tender Offer. This Schedule 13D disclosed that defendants' had acquired over 5% of Sunglass Hut's stock in April of 2000 and that Shade had not made any earlier report of that acquisition.

*Sanders v. Thrall Car Manufacturing Co.*, 582 F.Supp. 945 (S.D.N.Y.1983), *aff'd per curiam*, 730 F.2d 910 (2d Cir.1984), is persuasive on this issue. In *Sanders*, plaintiffs alleged that defendants had violated Section 10(b) during a tender offer by failing to disclose certain information material to the tender offer. *Id.* at 964. However, by the time the tender offer was made, the defendants had fully disclosed all of the allegedly deceptive omissions. *Id.* The court held that, because plaintiffs who had tendered their shares had all the relevant information, those sales were not "in connection with" the allegedly deceptive or manipulative practice, and plaintiffs had not stated a claim. *Id.* at 965–66. Here, assuming that defendants had a reporting obligation because of its purchases on April 19 and violated that obligation, the Schedule 13D enclosed in the Tender Offer cured the defect. As plaintiffs had all the information at the time they made their decision to accept the Tender Offer, they cannot argue that they relied on defendants' failure to file a Schedule 13D in tendering their shares.

Plaintiffs attempt to distinguish *Sanders* from the case at bar on the ground that, in *Sanders*, unlike here, there was no claim that the alleged omissions were not revealed until after the board had approved the Tender Offer. Plaintiffs argue that, because the alleged omission was cured with the announcement that the Board had accepted the Tender Offer, there was no opportunity for investors to "bid-up" the price of the Sunglass Hut stock. Put simply, plaintiffs are alleging that defendants intentionally failed to file a Schedule 13D until after they had set an artificial ceiling on the price of Sunglass Hut's stock. What plaintiffs fail to adequately explain, however, is how defendants' actions caused plaintiffs to sell their shares. The facts alleged by plaintiffs, if accepted as true, merely demonstrate that *the Board, not plaintiffs*, may have relied on the omitted Schedule 13D. To state a claim, plaintiffs must assert that *they* relied on the omission or misstatement, not that a third party did. Plaintiffs' claim fails because they have not alleged that the failure to file a timely Schedule 13D caused them to tender their shares; rather, they have alleged only that it may have resulted in a lower share price.

In sum, plaintiffs have failed to allege that defendants' failure to file a Schedule 13D was an omission upon which they relied when they tendered their shares. Because they cannot make such an allegation, given that the Schedule 13D was included as an exhibit to the Tender Offer, plaintiffs' Section 10(b) claim is dismissed without leave to amend.

### Breach of Fiduciary Duty

Plaintiffs also bring state law claims of breach of fiduciary duty against Hauslein and Director Defendants pursuant to Florida statute. Fla. Stat. § 607.0830. The essence of these claims is that, by entering into the Consulting Agreement, Hauslein and, through their acquiescence, the Directors (together with Hauslein, "Director Defendants"), failed to ensure that plaintiffs received maximum value for their shares. Plaintiffs also claim that Luxottica and Shade Acquisition aided and abetted Hauslein's breach. Director Defendants move to dismiss these claims pursuant to Rules 12(b)(6) and 9(b) of the Federal Rule of Civil Procedure. They claim that: (1) plaintiffs have failed to state a claim for breach of fiduciary duty;

(2) plaintiffs have not satisfied the fraud pleading requirements of Rule 9(b); and (3) they are entitled to the protection of the business judgment rule. Luxottica and Shade Acquisition also move to dismiss the aiding and abetting claims on the ground that, if the court dismisses the federal claims against them, the court would no longer have jurisdiction over the breach claims. As the predicate for Luxottica's and Shade Acquisition's motion has not been found, their motion to dismiss this claim is denied.

■ The law applicable to issues of corporate governance, such as the breaches of fiduciary duty alleged in this action, is that of the state of incorporation. *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir.1980); see RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 309 cmt. c, (1971) (in disputes involving directors' liability, there is a presumption in favor of applying the substantive law of the state of incorporation). It is not disputed that Sunglass Hut is a Florida corporation and that Florida law is controlling. Under Florida law a director is charged to act:

> [i]n good faith ... with the care an ordinarily prudent person in a like position would exercise under similar circumstances ... and [i]n a manner he or she believes to be in the best interest of the corporation. Fla. Stat. § 607.0830(1).

■ Plaintiffs claim that Hauslein engaged in self-dealing by accepting the Consulting Agreement and that the Directors, by accepting Hauslein's recommendation regarding the Tender Offer, were complicit in Hauslein's breach. Director Defendants argue that, because the Tender Offer was voluntary in nature (as opposed to a cash-out merger), plaintiffs must allege "coercion or disclosure violations" to avoid dismissal. In support of this, Director Defendants cite cases arising out of Delaware

corporate law. While Florida law has codified general standards of corporate governance, "[t]he Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines." *International Ins. Co. v. Johns*, 874 F.2d 1447, 1459 n. 22 (11th Cir.1989). Plaintiffs challenge Director Defendant's reliance on Delaware law and submit Florida precedent in support of their position.

Even under the cases relied upon by Director Defendants, there is no basis to dismiss plaintiffs' breach of fiduciary duty claims as a matter of law. The thrust of the cases relied upon by Director Defendants is that, if plaintiffs do not allege a coercion or a disclosure violation, then the decision to sell into the tender offer was voluntary and therefore, plaintiffs cannot show that the actions of Director Defendants harmed them. *See e.g. Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 40 (Del.1996)(where tender offer is voluntary and no coercion or disclosure violations exist, adequacy of price cannot be an issue). Director Defendants then argue that plaintiffs' claims must be dismissed either because they have failed to allege a disclosure violation or coercion or, if the court interprets plaintiffs' claims as having properly alleged a disclosure violation or coercion, those claims fail the specificity requirements of Rule 9(b). Plaintiffs claim that Hauslein was offered the Consulting Agreement in exchange for his support of the Tender Offer, in violation of his obligations under Fla. Stat. § 607.0830(1) to act "in the best interests of the corporation." Plaintiffs further argue that Director Defendants failed to act in the best interests of the corporation through their acceptance of the Tender Offer despite knowing that the price offered may have been negatively affected by the Consulting Agreement. That Hauslein's decision to support the Tender Offer *may* not have

been influenced by the Consulting Agreement, and his reasonableness in supporting the Tender Offer, present issues of fact, as does the Directors' reasonableness in accepting it. Moreover, the conflict is not eliminated simply through Director Defendants' claimed disclosure, because plaintiffs are claiming that Hauslein's disclosure was not complete. Simply put, plaintiffs are claiming that Hauslein did not reveal his true motivation behind his acceptance of the Tender Offer and that the Directors failed in their obligations to ensure that the negotiations were conducted in the shareholders' best interests. Accordingly, plaintiffs' have properly alleged a claim for breach of fiduciary duty against Director Defendants.

■ The claim that plaintiffs have failed to comply with Rule 9(b) is meritless. Rule 9(b) does not apply where a plaintiff has not alleged fraud. Plaintiffs allege that Hauslein and the Directors breached their "fiduciary obligations to act in the best interest of the Company and its shareholders, not that they have attempted to induce action or inaction on the part of the investors by means of falsehoods or material omissions." *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F.Supp. 783, 804–5 (S.D.N.Y. 1997), *rev'd in part on other grounds sub nom. Strougo v. Bassini*, 282 F.3d 162 (2d Cir.2002) (Rule 9(b) does not apply to breach of fiduciary duty claim not sounding in fraud); *see United States v. Rivieccio*, 661 F.Supp. 281, 290 (E.D.N.Y. 1987)(Rule 9(b) "does not extend to claims of breach of fiduciary duty.") Accordingly, plaintiffs are obligated to comply only with the notice pleading standard of Federal Rules of Civil Procedure 8(a), which they have done.

■ Finally, Director Defendants claim that they are entitled to the protections of the business judgment rule in con-

nection with their decision to acquiesce to the Consulting Agreement and approve the Tender Offer. However, any purported exercise of business judgment by Director Defendants is "a question of fact that should not be considered in a motion to dismiss." *In re Southeast Banking Corp.*, 827 F.Supp. 742, 754–55 (S.D.Fla. 1993), *rev'd in part on other grounds*, 69 F.3d 1539 (11th Cir.1995); *See also FDIC v. Gonzalez–Gorrondona*, 833 F.Supp. 1545, 1561 (S.D.Fla.1993).

### Conclusion

Defendants' motions are granted in part and denied in part. Plaintiffs have failed to state a claim pursuant to Section 10(b) of the Act and accordingly this claim is dismissed without leave to replead. Plaintiffs have stated claims for violations of the Williams Act and breach of fiduciary duty, and defendants' motions are denied as to these claims.

**SO ORDERED.**